[Crim. No. 6811. In Bank. Aug. 31, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. ELBERT
LYNDON CARTER, Defendant and Appellant.

Charles A. James and Nathaniel S. Colley, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Plaintiff and Respondent.

SCHAUER, J.—Defendant appeals (under Pen. Code, § 1239, subd. (b)) from a judgment which imposes two death sentences, and from an order denying his motion for new trial or reduction of the offenses or penalties. He was tried by jury on charges of kidnaping George Woehrle for the purpose of

robbery (Pen. Code, § 209) and murder of the same victim (Pen. Code, § 187). The jury found him guilty of each count; it further found as to count one that the victim suffered bodily harm and as to count two that the murder was of the first degree, and fixed the penalty as to each count at death. Defendant complains of the denials of his motion for change of venue and his challenges to the jury panel and to certain individual jurors. He objects to the trial court's refusal to order a daily transcript. He argues that the evidence does not support the verdicts, and that there was prejudicial error in the receipt of evidence of confessions and admissions, in argument of the district attorney, and in the giving and refusal of instructions. And defendant contends that the imposition of two death penalties, on the facts, constitutes double punishment for one act. We have concluded that there was no prejudicial error (Cal. Const., art. VI, § 4½), that the trial was fair substantively and procedurally, and that the judgment and order should be affirmed.

*Evidence (Apart from Defendant's Extrajudicial Admissions or Confessions) of Objective Facts of the Crimes.* At the time of the offenses (April 22, 1960) defendant, then 23 years of age, lived with his parents in Stockton. He was seeking employment, had obtained placement on the eligibility list for appointment as psychiatric technician trainee at Stockton State Hospital, and had taken examinations for probationary patrolman on the Stockton police force. He had had an affair with a Stockton girl and as a result she had just had a baby.

About 11:20 a. m. on April 22 Officer Woehrle of the Stockton police juvenile detail told his superior officer that he was going to serve defendant with a warrant for his arrest on a charge of statutory rape of the girl. Woehrle was wearing slacks and a sport jacket and driving a station wagon without police markings. He wore his .38 special Smith & Wesson revolver in a belt holster.

Defendant's mother, Mrs. Carter, testified as follows: At about 11:30 a. m. she looked into her living room and saw defendant with "a white person" whom she did not recognize. Shortly thereafter she started to enter the living room but defendant said, "Mother, mother, mother, don't come in." He spoke in "a crying voice. I have never heard him sound like that before." "[T]he tone of his voice confused me." Mrs. Carter went out the back door of the house, walked to the front, and saw defendant and "this other man that was with

him.'' In front of the house were two cars, defendant's and another automobile which perhaps was a station wagon. Defendant and the other man ''were in or about this other car.''

Mrs. Carter reentered the house and attempted to telephone another son and her sister-in-law but she was so upset that she was unable to complete either call. She then telephoned the police department, gave her name and address, ''and told them that my son, Elbert [defendant], and someone had gone some place and I didn't know where, it might not be anything wrong but I would like for somebody to come out and at least find out what it was.''

At about noon police officers came to the Carter home and found Officer Woehrle's jacket in the living room. In the jacket pockets were the warrant of arrest and Woehrle's badge and identification card.

Meanwhile the station wagon, with Woehrle at the wheel and defendant beside him, proceeded erratically to a point beyond the city limits of Stockton. At approximately 11:50 a. m. it stopped near the Johns-Manville plant, about 3½ miles from defendant's home. The testimonies of five eye-witnesses (three plant employes and two persons who were passing in a car) describing various portions of the following events may be thus epitomized:

''The passenger's side door [of the station wagon] came open and two men who were fighting fell out of the car. . . . [O]ne was white and one was colored. . . .'' ''[T]hey both got up and . . . the colored man made a quick motion, looked like he moved his knee rather sharply. . . .'' ''[T]hey were still struggling out there for some object that one of the men held in his hand.'' Other testimony shows that this object was defendant's revolver. ''They struggled there for a while until this man brought up his knee and kicked this other man in the groin.'' ''I saw the colored guy strike the other man, which appeared to be a smaller man, twice on the head with a pistol. . . . I saw this colored man place the pistol to or right near his [the smaller man's] back and I heard the report of the pistol.'' The man with the pistol reentered the station wagon and drove away.

Officers, summoned by the observers of the struggle, arrived at about noon and found Officer Woehrle dying. A subsequent autopsy and criminologic examinations disclosed that he had suffered the following wounds: gun powder burns on the right index finger; abrasions and contusions on the face; a laceration on the back of the head which could have been

caused by the blow of a gun barrel; a wound from a .22 caliber bullet which entered in front of the left ear and lodged in the temporal bone; a wound from a .22 caliber bullet which entered the lower back and went up through the body into the chest; another bullet wound which followed a similar course. The two latter wounds, either of which would have been fatal, were made by bullets fired from a .22 caliber revolver owned by defendant. One of the fatal shots had been fired at a range of one inch or less, the other at a range of 20 inches or more.

At about 12:15 p. m. the same day (April 22) three officers of the California Highway Patrol, mounted on motorcycles and alerted by radio to watch for the Woehrle station wagon, saw it, driven by defendant at a normal speed, about 18 miles from the Johns-Manville plant where Woehrle was killed. The officers turned on their red lights and sirens and defendant at once accelerated. Pursued by the officers, defendant drove for about 6 miles at speeds sometimes exceeding 100 miles an hour. He entered a subdivision in the city of Modesto and outdistanced the officers. They lost sight of him, then saw him driving toward them at a speed of about 25 miles an hour. One of the officers motioned for defendant to stop. Instead defendant thrust Woehrle's .38 pistol out the window, fired at the officer and swerved toward him at an accelerating speed. The three officers began firing at defendant. One of their bullets punctured a tire of the station wagon and it skidded to a halt.

Defendant ran into a garage and then entered the house of the Harry Gormans. While two of the officers were summoning reinforcements Mr. Gorman ran from the house with his infant and said that his wife and another child were still inside. Defendant fired from the house through a closed window; the officers did not return fire because of the presence of the woman and child. One of the officers went to the rear of the house. Defendant stepped from the rear door and he and the officer fired at one another almost simultaneously. Defendant jumped back in the house, laughed derisively, and said, "Did I get you?"

Other officers arrived and surrounded the house. The Modesto Chief of Police, through an amplifier, called to defendant, "Come out with your hands up and you will not be harmed." After several repetitions of the call defendant came out the front door. He had sustained a very minor bullet wound on the inner left arm at the elbow. He did

not appear excited and spoke quietly. Asked why he surrendered, he replied, "You won't believe this, I don't remember anything."

In the Gorman home on a bedroom floor were an empty cartridge box, eight cartridges which had been fired from defendant's .22 revolver, and Woehrle's .38 revolver containing six spent cartridges. Defendant's .22 revolver was on the kitchen stove. Three spent .22 cartridges and pieces of spent lead were on the stove and floor.

In the windshield of Woehrle's station wagon were five holes apparently made by bullets fired from inside the wagon at close range and one by a bullet which had been fired from outside the windshield. There were a number of bullet holes on the outside of the wagon. On the front seat was Woehrle's holster. There was blood on the back of the front seat and fragments of a .22 caliber bullet in the car.

*Extrajudicial Statements of Defendant.* After his surrender in Modesto defendant was handcuffed and placed in a police car by Captain Coulson of the Modesto police. The captain testified that no threats or promises were made to defendant and that his statements to the captain were voluntary. As they sat in the police car near the Gorman home, according to the captain's testimony, "we talked about everything in general. . . . I asked him what his father did and he told me that his father was a minister . . . in Stockton. He also stated to me that he had applied and had passed the examination and was on the list for a police officer's job. . . ." They spoke of mutual acquaintances in Stockton and Modesto. There was no talk of the crimes, except that defendant "stated that he didn't remember anything that happened in Stockton or what he was doing [in Modesto]." During the conversation the captain took defendant out of the police car two or three times at the request of photographers who wanted his picture.

The captain then took defendant to the hospital to have his arm dressed. They sat in the back seat of the car. In the front seat were two other officers who took no part in the conversation. Captain Coulson testified that on the way to the hospital "I told Mr. Carter that we had been very nice to him, why didn't he tell me what took place." Defendant then made the statement quoted in the footnote;[1] his descrip-

[1] Defendant said that on the morning of April 22 he "found a police officer talking to his mother in the front room. The officer told him that he had a warrant for him and he asked the officer that 'I thought I had

tion therein of physical events preceding, during, and after
the crimes is less detailed than the above recounted evidence
adduced at the trial from other witnesses (defendant did not
testify), but in large part it accords with such other evidence.

After a visit to the Modesto emergency hospital defendant
was returned to Stockton. There, beginning at 3:35 p. m.,
in the detective division of the police department, defendant
made a statement which, according to the testimony of the
reporter who recorded it, was free and voluntary. Present
were the district attorney, a deputy district attorney, and
five police officers. The questioning was conducted by the
deputy district attorney. The pertinent parts of the state-
ment are set out in the footnote.[2] Although there are a few

---

this straightened out with the District Attorney's office' and the officer
says 'Well, the mother signed a complaint against you and the charge
is rape.' Mr. Carter then stated that he asked the officer if he could go
into the bedroom and change his clothes as . . . he was dirty. The officer
said that he could do so. Mr. Carter stated to me that he went into the
bedroom, changed his shirt, and . . . noticed his twenty-two pistol laying
on the dresser and he picked up the twenty-two pistol, walked out into
the front room and pointed it at the officer and told the officer to take
off his coat and drop his gun. Mr. Carter stated that his mother told
him not to do that, but he did not pay any attention to what she said,
that he told the officer to walk out of the house and get into the car.
Mr. Carter then stated to me that they got into the car with the officer
driving and he says 'Head out this road.' They proceeded out into the
country. . . . [H]e told the officer to stop and . . . 'If you want to walk
away alive don't try anything funny.' Mr. Carter stated then that the
officer grabbed onto the barrel of the pistol. There was a struggle in
the car and somehow they found themselves outside. . . . While they were
struggling Mr. Carter stated that he heard a shot. The officer continued
holding onto the barrel. There were some blows struck by both parties
and the officer fell to the ground and Mr. Carter then told me that he
heard two more shots. . . . He then jumped into the car and left. He
stated that he come [*sic*] down 99 Highway and some police officers on
motorcycles were after him and then he run [*sic*] into a house and that
was all that he could state to me of what happened. . . .

''He said that he did not intend to harm anyone.''

[2]On the morning of April 22 Officer Woehrle came to defendant's home
and said he had a warrant for defendant's arrest on a charge of statutory
rape made by the mother of defendant's girl friend. With the officer's
permission defendant went to his bedroom to change his clothes. He
concealed his .22 revolver in the sleeve of his coat, returned to the living
room, displayed the gun, and told Woehrle, ''Raise your hands, take off
your coat.'' Woehrle ''stood up, took off his jacket, . . . let the gun [the
officer's holstered .38 revolver] fall to the floor.'' Woehrle said, ''Wait a
minute, kid. Wait a minute, kid.'' Defendant picked up Woehrle's gun
and holster and ordered the officer to go to his car. Defendant's mother
came into the room and said, ''Don't hurt him.'' Defendant replied,
''I'm not going to hurt him. I just want his car.''

As ordered by defendant, Woehrle drove out of Stockton and stopped
near the Johns-Manville plant. The officer then hit defendant's .22
revolver which defendant was holding. ''It went off, . . . he grabbed my
arm and came across the seat, we struggled.'' They came out of the

slight variances from the objective facts described by other witnesses, the overall correspondence of defendant's account to the events as related by others is striking.

*Psychiatric Testimony.* At the request of the district attorney two psychiatrists examined defendant soon after he made the statement quoted in footnote 2. Dr. Peal began his examination at about 5 or 5:30 p. m. on April 22 (the day of the crimes) and further examined defendant on April 24.

---

wagon, fighting for defendant's gun. "I kicked him first and then he kicked me." While they both held the .22, Woehrle reached the hammer and the gun fired twice. "I started hitting him with my left hand. . . . [H]e went down. . . . Then I hit him on the head with the gun. . . . [H]e dropped to his knees. . . . He did something but I don't remember what. . . . I remember I shot him. . . .

"[Q. by the deputy district attorney.] Now, did you shoot him a second time? A. I don't remember. . . . I know he was doing something that was aggravating me. . . . I don't remember what . . . , maybe it was just struggling."

Defendant got into the officer's car and drove away, going "[n]owhere in particular. . . . I was driving for a long time. . . . I saw the three officer motorcycles. . . . I speeded up. . . . I knew they were after me. I could hear the police calls on the radio. . . . I speeded up to about a hundred miles an hour."

Because the pursuing highway patrol officers were drawing closer, "I turned off into this community housing project. . . . Then I was going to try to lose them, then I went . . . down one block and then back, . . . when they come around the corner ahead of me and started shooting. . . ."

"[O]ne bullet come [*sic*] through the window, I ducked down. I started shooting back. . . . Off and on I used [both Woehrle's .38, for which defendant had no more ammunition, and defendant's .22, for which he had a box of shells.] . . . [G]lass was splattering in . . . my face. . . . I ducked down to avoid the bullets. I come [*sic*] up, there was a garage sitting in front of me. I was swerving to avoid hitting the garage. . . .

"[Defendant] jumped out of the car, run [*sic*] around in back of this house, in a little screen door. . . . I remember seeing three highway patrolmen. . . . I guess they surrounded the house. . . . I don't remember any more shooting after that. . . .

"When I ran in . . . there was a lady and a little girl. . . . The little girl saw me first, she screamed and ran to her mother and then I think the mother screamed. . . ." Defendant believes that the mother and child left the house. He reloaded his .22. "I went to the door and I kind of stuck my head out and zingo, right in the arm. . . . I could see a blue helmet. I knew it was a police officer. . . . I ducked down. . . . I shot at him and then I went back into the house. . . . I shot at another officer out in front. . . .

"I was wandering through the house, just thinking and wondering what to do. They kept saying, 'Come on out, we won't hurt you, come on out.' . . . So finally I, I left my gun on the counter and came out. . . ."

Defendant further said that Woehrle was not "aggravating" him when the officer came to the house with the warrant, but defendant was "mad" because "this lady [the mother of defendant's girl friend], she didn't have to do that." When defendant at gunpoint ordered the officer to drive him, "I wasn't intending to take it [defendant's anger at "this lady"] out on him. I wanted to more or less just get away. I just wanted his car." It was only during the struggle after Woehrle at-

Dr. Toller commenced his examination at about 8:40 p. m. on April 22. Another psychiatrist, Dr. Catton, at the request of defense counsel, examined defendant on May 28, 1960, and continued his studies of defendant up to the time the doctor testified (August 24, 1960).

Dr. Catton and Dr. Peal, testifying for defendant, were of the opinion that at the time of the crimes he could not premeditate the formation of an intent or deliberately carry out his purpose. Dr. Catton believed that defendant was in a state of "dissociation," whereas Dr. Peal described defendant's behavior as the result of "a panic reaction."

Dr. Toller testified for the People on rebuttal that in his opinion defendant had the capacity to form the intent to kill and to escape, and the capacity to deliberate and premeditate; that defendant reacted in anger when he "was subjected to what he considered was an unfair frustration," i.e., the arrest for statutory rape without warning from his girl friend and without having "had a chance to talk things over" since the birth of the baby four days before.

 The three psychiatrists gave detailed explanations for the reasons for their differing opinions. These views need not be set out here, since it was for the jury to resolve the conflicts in the expert testimony, accepting such of it, or none of it, as they saw fit. (See *People* v. *Rittger* (1960), 54 Cal.2d 720, 730 [3] [355 P.2d 645].)

 *Proof of Corpus Delicti.* Defendant argues that without his extrajudicial admissions the corpus delicti of the crime of kidnaping for the purpose of robbery is not established. As we have seen, apart from any statement of defendant, there is evidence, direct, circumstantial or inferential, of the following facts: Officer Woehrle went to defendant's home to serve him with the warrant. He left in his own car with defendant. The evidence that he abandoned the warrant and his coat, badge, and identification card, and that he later struggled with and was killed by defendant, amply supports

tempted to seize the gun that defendant became "aggravated" at him, "because he wouldn't go down, I suppose."

At the end of the statement appear the following questions and answers: "Q. You have talked to me because you desired to talk to me of your own free will, is that correct? A. Yes. . . . Q. I didn't threaten you in any manner? A. No. Q. Didn't promise you anything to have you tell me—— A. No. Q. As a matter of fact, from your background you knew you had a right not to talk to me if you didn't want to, didn't you? A. Yes. Q. You told us this to clear it up, is that right? A. Yeah. Q. And you wanted to tell us this? A. Yes."

an inference that the officer did not accompany defendant voluntarily. From defendant's taking of Woehrle's car and gun the jury could choose, among various reasonable inferences, the one that a purpose of the abduction was the felonious taking of the property. Thus without defendant's extrajudicial admissions the evidence is sufficient to show not only the corpus delicti—the elements of the crime—but also the fact that it was committed by defendant.

*Voluntariness of Defendant's Confessions or Admissions.* Defendant asserts that his statement to Captain Coulson of the Modesto police and thereafter to authorities in Stockton were made in circumstances which show without conflict that they were the product of psychological coercion. He urges that the following circumstances compel an inference that the atmosphere when he made his statements was hostile and coercive: he was in the control of law enforcement officers, accused of having killed a fellow officer; he had been arrested for the killing soon after he engaged in a gun battle with highway patrolmen; and his surrender had been effected by surrounding him with a large number of state, county, and city officers. Defendant further argues that the evidence impels the conclusion that he was incapable of making a voluntary statement, or at least peculiarly subject to psychological coercion, because of his disturbed mental and emotional condition, his wound, and the hostility directed against him. In these circumstances, defendant says, the deputy district attorney, by the form of his questions, "put words in the mouth of the defendant."

The officers present when defendant made the statements did not express hostility by word or gesture. Indeed, there is no evidence that any officer at any time after defendant surrendered expressed any unpleasantness to defendant except that at the time of his arrest someone said, in defendant's words, "Nothing worse than just a bad name."

Defendant's wound was only a small abrasion. There is no evidence that he appeared distressed when he made his statements, and any emotional disturbance he was suffering was not the result of improper action of any law enforcement officer. Some of the questions of the deputy district attorney were leading, but they were not unfair. Although defendant had psychological difficulties, he was of normal intelligence, had gone to junior college, and had a good record in the Air Force. He answered the deputy's questions readily and his

answers appear to be the product of his own recollection, not of suggestions of the deputy.

■ "A display of force in effecting an arrest [where there is no improper official conduct which continues to subvert the will of defendant] has been held not to affect a confession subsequently made." (*People* v. *Burwell* (1955), 44 Cal.2d 16, 31 [11] [279 P.2d 744].)　■　The admission in evidence of defendant's statements was proper.

■ *Instructions as to Unconsciousness.* Defendant urges prejudicial error in the refusal of his requested instructions concerning unconsciousness. It is code law that "All persons are capable of committing crimes except [among others] . . . [p]ersons who committed the act charged without being conscious thereof." (Pen. Code, § 26, subd. Five.) The trial judge determined that there was evidence which warranted submission of the defense of unconsciousness to the jury and correctly instructed them on the subject.[3]

Defendant says that the instructions given were inadequate because they contained no "explanation clarifying the legal concept of consciousness to be applied." The refused instructions attempt to give such "explanation." In this they are not successful. They seek to clarify the concept of "conscious mind" by contrasting it with "subjective mind," but the latter phrase has no legal meaning, is not used in a medical sense in the proposed instruction,[4] and would tend to confuse rather than enlighten the jury.

Defendant says that without his proposed instruction next quoted in the footnote[5] "a jury could naturally be expected to have understood [the instructions given, quoted *ante,* fn. 3] to refer to a person in a coma"; by "coma," it ap-

---

[3]The instructions given were:

"Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime." (First paragraph of CALJIC (rev. ed. 1958) No. 71-C.)

"If you should find that the defendant committed an act, which, if he was conscious, would have constituted the crime charged against him or would have been an element of that crime, and, if you have a reasonable doubt whether the defendant was conscious at the time of such act, you should find that he was then unconscious." (Second paragraph of CALJIC (rev. ed. 1958) No. 71-D.)

[4]Indeed, C. G. Jung says, "In contrast to the subjectivism of the conscious mind the unconscious is objective. . . ." (The Undiscovered Self (1957), p. 86.)

[5]"In order for a person to be unconscious in the sense that such condition relieves him of criminal responsibility for the performance of the act, it is not necessary that such person be in a state of coma or in a condition wherein he can neither move, talk or speak."

pears, defendant means ''a condition wherein he can neither move, talk or speak.'' The instruction which defendant requested would have diverted the jury's attention from the facts of the case before them, for there is no evidence whatsoever that defendant was in a ''coma''; all of the pertinent evidence shows that he could, and did, move, talk and speak. The instructions given, on the other hand, apply to such facts, for they refer to defendant's *commission of an act* ''without being conscious thereof.''

Also defendant's proposed instructions would have led the jury to believe, erroneously, that a defendant suffering from an irresistible impulse or uncontrollable compulsion is unconscious.[6] Such a view is not tenable factually or legally. (See *People* v. *Gorshen* (1959), 51 Cal.2d 716, 726-728 [2-4] [336 P.2d 492]; *People* v. *Nash* (1959), 52 Cal.2d 36, 45 [338 P.2d 416].)

■ *Instructions as to Murder in the Perpetration of Robbery.* The judge told the jury that ''Murder which is committed in the perpetration or attempt to perpetrate robbery is murder of the first degree, whether the killing was intentional, unintentional or accidental'' (CALJIC (rev.ed. 1958) No. 302-F), and four other instructions refer to this rule. Defendant urges that the crime of murder in the perpetration of robbery was unduly emphasized by repetition and, further, that the instructions as to such crime should not have been given because the evidence would not support a finding that defendant committed robbery. (Although defendant does not spell out the point this argument would also apply to the instructions as to robbery and kidnaping for the purpose of robbery.)

From the objective facts that defendant killed Woehrle after a struggle and took his gun and his car, all within less than one half hour, the jury could infer that he killed to effect, or in the course of, robbery. Furthermore, there is competent evidence of extrajudicial admissions of defendant that he wanted the car. The fact that robbery-murder was referred to several times in correct instructions did not amount to improper or distorted emphasis.

---

[6]The proposed instructions would have told the jury that ''*A person is conscious when* his mind is in such a condition that *he* is immediately aware of the things going on about him and *can control his own acts and conduct, feelings and thought.* In the relation to the performance of an act, a person is conscious *when his mind* functions and it *determines and controls the action.*'' (Italics added.)

■ *Failure to Instruct as to the Lesser Offenses of Manslaughter and Simple Kidnaping.* Defendant complains of the trial court's refusal to give instructions requested by him, or any instructions, concerning manslaughter. Such refusal was proper for "it must be said as a matter of law that, accepting the defendant's version of what took place, the crime could not have been manslaughter." (*People* v. *Zilbauer* (1955), 44 Cal.2d 43, 49 [3] [279 P.2d 534].) Defendant's argument that the killing could be found to be voluntary manslaughter overlooks the factors which we italicized in defining and explaining that crime in *People* v. *Brubaker* (1959), 53 Cal.2d 37, 44 [5, 6] [346 P.2d 8]:

■ "Voluntary manslaughter is a willful act, characterized by the presence of an intent to kill, *engendered by sufficient provocation* and by the absence of premeditation, deliberation and (by presumption of law) malice aforethought. Section 192, subdivision 1, of the Penal Code defines voluntary manslaughter as the unlawful killing of a human being, without malice, 'upon a sudden quarrel or heat of passion.'

■ "To be sufficient to reduce a homicide to manslaughter, the heat of passion must be such as would *naturally be aroused* in the mind of an *ordinary, reasonable person* under the given facts and circumstances, or in the mind of a person of *ordinary self-control.*"

■ Defendant argues also that "the jury could infer that the defendant, in the process of trying to resist arrest (which is a misdemeanor [Pen. Code, § 148]) engaged in a struggle with the officer and killed him." On defendant's theory this would be involuntary manslaughter "in the commission of an unlawful act, not amounting to felony." (Pen. Code, § 192, subd. 2.) Such theory has no support in the facts here. Defendant's own admissions show that he killed, at the least, in perpetrating the felony of kidnaping. (*Cf. People* v. *Zilbauer* (1955), *supra,* 44 Cal.2d at pp. 50-51 [4a-4b].)

It should also be mentioned that the refusal of instructions as to manslaughter could not possibly have been prejudicial. The jury found that the kidnaping was for the purpose of robbery; therefore, on the facts, they must have concluded that (whether or not the killing was deliberate and premeditated) defendant committed murder in the perpetration of robbery.

■ Defendant did not request an instruction as to simple kidnaping. The People did request such an instruction

and defendant urges that he was prejudiced by the trial judge's refusal to give it. Because of the following circumstances no prejudice in this regard appears.

The jury were told that "An essential element of [the] crime charged . . . in Count One . . . is a specific intent to commit robbery," and again, "in the crime of Kidnaping With the Intent to Commit Robbery, a necessary element is the existence in the mind of the perpetrator of the specific intent to commit robbery."

They were further told that "As to COUNT ONE, you may render one of the following verdicts:

"We . . . find the defendant . . . Guilty of a violation of Section 209 of the Penal Code . . ., to-wit: Kidnaping to Commit Robbery. . . .

"We . . . find the defendant . . . Guilty of a violation of Section 207 of the Penal Code . . ., to-wit: Simple Kidnaping, a Felony, an offense included in the charge as set forth in Count One of the Indictment herein, or

"We . . . find the defendant . . . not guilty of Count One. . . ."

Appropriate forms of the foregoing verdicts were furnished the jury. They were thus apprised that they could convict of the included offense of simple kidnaping.

 *Double Punishment.* Defendant correctly points out that to punish him both for kidnaping for the purpose of robbery with infliction of bodily harm, and for the murder which was the indivisible culmination of the infliction of bodily harm, would be double punishment in violation of Penal Code, section 654. However, since there can be but one execution of the death sentence, no purpose would be served by reversing either sentence. (*People* v. *Chessman* (1959), 52 Cal.2d 467, 495-496 [19] [341 P.2d 679], cert. denied, 361 U. S. 925 [80 S.Ct. 296, 4 L.Ed.2d 241]; *People* v. *Wein* (1958), 50 Cal.2d 383, 409 [42] [326 P.2d 457]; *People* v. *Smith* (1950), 36 Cal.2d 444, 448 [4b] [224 P.2d 719].)

 *Asserted Misconduct of Prosecuting Attorney.* In his opening statement the district attorney said that on the morning of April 22 when Officer Woehrle went to the Carter home, Mrs. Carter, in her bedroom, "heard loud voices emanating from . . . the living room." Defendant "assign[ed] this as prejudicial misconduct" because "counsel cannot . . . prove what he has stated." The trial judge said, "The statements of counsel constitute no evidence in the case. Counsel was merely stating what he expects to prove."

During Mrs. Carter's testimony for the People the following occurred:

"Q. Did you hear anything while you were in this bedroom . . .? A. Other than the radio I don't recall any voices. . . . [I]t was on very loudly. . . .

"Q. . . . [A]s a matter of refreshing your recollection . . . you recall testifying before the Grand Jury don't you? . . . A. Yes, I recall. . . .

"Q. And do you recall testifying there that your attention was called to loud voices in the living room? . . .

"THE COURT. You'd better read the alleged testimony.

"[The district attorney.] Now, this is what you said. Inasmuch as I have referred to this, I will read it so that it will be clear that I was in error with respect to this particular portion of it, in fairness to the witness I feel that it should be read, because it does substantiate what she says." The district attorney then read, "Did you hear anything that was said during that time that you were in there dressing . . .? Answer. No." Defense counsel said, "We appreciate counsel's fairness in bringing this out," and the district attorney replied, "I was in error and she was correct."

Closing argument was presented by a deputy district attorney. He mistakenly said that "Mrs. Carter stated that . . . she heard some loud talking." Defense counsel objected that this was "prejudicial misconduct," and the deputy said, "[A]nything that is not helpful to your defendant is prejudicial." The trial judge said, "The jury will be instructed again that the statements of counsel constitute no evidence whatsoever. Counsel is stating his recollection of the evidence. You will determine what the evidence is and not counsel. Don't accept his word for the evidence."

The remark of the deputy district attorney as to prejudice was ill-advised, and the trial judge might well have said directly that the deputy had misstated the evidence, rather than merely telling the jury, "Don't accept his word for the evidence." But as is apparent from the district attorney's remarks during his examination of Mrs. Carter, his misstatement was inadvertent rather than in bad faith. And the subject matter of the misstated testimony is, in the circumstances, so utterly trivial that no possibility of prejudice appears. There is no merit in defendant's claims that other portions of the People's argument, which need not be set out here, amounted to prejudicial misconduct.

*Denial of Daily Transcript.* Defendant requested a daily transcript. The trial judge said, "I'm sorry, but the court will have to deny that request. I see no reason to burden the County with the expense." Defendant urges that every defendant on trial for a capital offense should be furnished with a daily transcript, and that the denial of one here deprived defendant of the effective aid of counsel because of the length of the trial; that counsel could have cross-examined more effectively if he had had the benefit of a transcript. (The district attorney made his opening statement on August 12, 1960; after nine and one half court days of trial the jury retired and returned with verdicts of guilty on August 30; and the trial of the issue of punishment consumed another day.)

The situation here is similar to that in *People* v. *Chessman* (1951), 38 Cal.2d 166, 176-177 [6] [238 P.2d 1001], in that the trial judge knew that the trial would be long and the death penalty would be sought. Furthermore the judge here must have known that much of the unfortunately protracted litigation in *Chessman* (see *People* v. *Chessman* (1950), 35 Cal.2d 455 [218 P.2d 769, 19 A.L.R.2d 1084], cert. denied, 340 U. S. 840 [95 L.Ed. 616, 71 S.Ct. 29], through the proceedings listed in *People* v *Chessman* (1959), *supra*, 52 Cal.2d 467, 503-507 [341 P.2d 679], cert. denied, 361 U. S. 925 [80 S.Ct. 296, 4 L.Ed.2d 241]) could have been avoided had the judge there granted Chessman's motion for a daily transcript. Also the possibility of burdening the county with additional expense would not appear impelling, since if defendant was convicted of any offense and appealed he would be entitled to a transcript without cost to him (*People* v. *Smith* (1949), 34 Cal.2d 449, 450 [211 P.2d 561]), and if the death penalty was imposed the appeal would be automatic (Pen. Code, § 1239, subd. (b)).

The arguments for requiring a daily transcript in every case where a defendant is tried on a capital charge are persuasive (see *California Death Penalty* (1959), 11 Stan.L.Rev. 94, 105, 132). It would seem that in the absence of some extraordinary showing (e.g., that the state was going to trial on a capital charge but could satisfy the judge at one and the same time both that a conviction thereon was unlikely and that the judge should not dismiss the case) the order for the daily transcript should be well nigh automatic. Indeed, in the parenthetical example it would appear questionable

economy to deny daily transcription; if the doubtful case was tried and did bring conviction, an appeal would almost surely follow. But here, as in *Chessman,* it does not "appear that defendant was prejudicially handicapped by want of a daily transcript. He presented his case and delivered his argument without any indication of confusion or uncertainty; accordingly, no miscarriage of justice on this account is established." (38 Cal.2d at p. 177.)

*Challenges to Jury and Motion for Change of Venue.* As stated above, defendant killed Officer Woehrle on April 22, 1960. On April 29 he was indicted for kidnaping and murder. May 2, 1960, was set as the time for arraignment and plea. On that day, at the request of defendant's counsel, the matter was continued. On May 17 defendant waived statutory time for going to trial ("60 days after the finding of the indictment"; Pen. Code, § 1382, subd. 2) and pleaded not guilty and not guilty by reason of insanity. (Defendant withdrew the latter plea after the jury returned its verdicts of guilty on the general issue.)

On July 28, 1960, the trial court denied defendant's motion for change of venue, without prejudice to its subsequent renewal if examination of veniremen should show that an unprejudiced jury could not be obtained. The court also denied defendant's challenge to the jury panel of San Joaquin County. Selection of the jury then began and proceeded for 16 calendar days (10 court days).

On August 10 defendant renewed his motion for change of venue, "incorporating in said motion the evidence adduced by testimony of the veniremen who have been excused for cause." The motion was again denied. Defendant also, in effect, renewed his challenge to the entire jury panel and moved that the jury commissioner (whose affidavit had been filed by the People on July 28) be subpoenaed for cross-examination. The trial court denied this motion.

On August 11 defendant, having exhausted his peremptory challenges, moved for allowance of additional peremptory challenges. Such motion, and defendant's further motion for a continuance of the trial to allow subsidence of asserted public feeling, were denied.

Defendant's challenge to the entire jury panel rested on his contention that the method of selecting the panel excluded "persons with the same racial, economic, social and geographic background as the defendant." While this is not literally made a ground of challenge to the panel by

statute,[7] defendant adopted an appropriate method of raising the contention. (*People* v. *White* (1954), 43 Cal.2d 740, 748 [278 P.2d 9].) ''The American system requires an impartial jury drawn from a cross-section of the entire community and recognition must be given to the fact that eligible jurors are to be found in every stratum of society.'' (43 Cal.2d at p. 754.) Defendant, however, did not show a factual basis for his contention. The jury commissioner's affidavit states that each year he sends about 2,500 jury questionnaires to persons indiscriminately selected from the register of voters and all telephone books of San Joaquin County and the Stockton city directory (sources approved in the *White* case, *supra,* 43 Cal.2d at p. 754) ; that he makes ''every effort to obtain representation of all the economic, social, religious, racial, political, and geographical groups of the County ; further, the questionnaires are also given to persons who volunteer, and to those recommended by other citizens ; that on more than one occasion he has encouraged civic leaders of the Negro community to obtain qualified volunteers for jury duty.'' The questionnaires do not ask for any indication of race and the commissioner does not ordinarily interview those to whom they are sent ; thus he does not know the race of the members of the panel selected. Also those to whom questionnaires are sent ''are selected alphabetically by name, with no reference to address, so that is no attempt to exclude any geographical segment of the county's population.''

Despite the jury commissioner's efforts, the panel during the years 1956, 1958, 1959, and 1960 (information for 1957 was not available) contained a disproportionate number of persons from north Stockton, whereas most of the hourly and daily wage earners and members of minority races in the county are residents of south Stockton. But that showing does not establish intentional, systematic discrimination against persons of defendant's race or economic status or geographical location. (Defendant is a Negro who resided in south Stockton ; he left junior college to serve in the Air Force, thereafter worked as a civilian air traffic control specialist in Oakland for

[7]Section 1059 of the Penal Code provides, ''A challenge to the panel can be founded only on a material departure from the forms prescribed in respect to the drawing and return of the jury in civil actions, or on the intentional omission of the sheriff, marshal, constable, or other officer, to summon one or more of the jurors drawn.'' Defendant has not shown any material departure of form or intentional omission to summon.

five months, and at the time of the killing had returned to the home of his parents and been without employment for about eight months.) So far as appears, the jurors and alternates selected were entirely impartial. They comprised two residents of Tracy, eight residents of north Stockton, one resident of south Stockton, and one resident of Stockton whose geographical location does not appear. Their respective occupations were as follows: production manager; farmer; carpenter; seamstress; manager of a television shop; service station attendant; bookkeeper; and five housewives, two of whose husbands were mechanics and the others were, respectively, a chef, an operator of heavy equipment, and a parts manager. So far as occupations are concerned, the jurors selected and the whole panel appear representative of a cross-section of the community. And, as already indicated, there is nothing to show that the geographical imbalance was deliberately created or resulted in partiality.

Defendant urges that he should have been allowed to cross-examine the jury commissioner. He cannot complain that he lost this opportunity because of the lack of timeliness of his request that the commissioner be subpoenaed.

Defendant, in an attempt to show that venue should be changed because public feeling was so intense that a fair trial could not be had in the county (Pen. Code, § 1033) presented affidavits and testimony to the following effect: After the commission of the offenses defendant's family received anonymous threatening telephone calls stating that defendant would die for the offenses and that his family should move out of town. Several inflammatory articles appeared in the Stockton Record, a newspaper of wide circulation in San Joaquin County. The only information defendant presented as to the content of the articles consists of averments that the headlines referred to him as a "cop killer"; that one article stated that Officer Woehrle's "kindness to people cost him his own life"; and that the editorial reprinted in the footnote[8] appeared in the paper of April

---

[8] "A POLICE OFFICER IS KILLED

"Few crimes are so shocking to society as the murder of a police officer in the performance of his duty. This duty, of course, is the protection of society against evil doers. Civilization's pattern long has conferred this authority on a body of picked employed men who are the People's representatives. The badges of authority they wear and the laws they are charged with enforcing originate from democratic processes. For these reasons an attack on a police officer is regarded by any organized society as an attack on itself and when a policeman is killed in such an attack

26. Defendant further avers that radio and television stations in the county made inflammatory references to the offenses. And he emphasizes that the victim was a well known, popular police officer.

Defendant also relies on the following matters developed on *voir dire* examination as showing local prejudice: All of the 115 veniremen who were questioned had read or heard something about the case. Forty challenges were allowed for actual bias consisting of the prospective jurors' fixed opinions of defendant's guilt.[9] Of these 40 recused veniremen, seven had known Officer Woehrle, one knew the Gormans (the Modesto family at whose home defendant was apprehended), and 32 based their opinions on what they had read or heard about the case.

In opposition to the motion for change of venue the People presented affidavits of law enforcement officials and officers of the Stockton Record and local radio stations to the following effect: There had been no public demonstrations against defendant, and attendance at his appearances in court had been small. The radio and newspaper publicity was not intended to inflame and was not unusual for reportage of crimes of this sort; it was considerable immediately after the crimes, but decreased during the three months preceding the motion for change of venue.

The trial judge was aided in his resolution of the conflicting contentions of defendant and the People concerning the temper of the community by the fact that he was, and had been for years, a resident of the county. ▇▇▇ "[H]is familiarity with conditions prevailing there enables him to pass more understandingly on a motion for change of venue than an appellate court." (*People* v. *McCracken* (1952), 39 Cal.2d 336, 344 [2] [246 P.2d 913].)

the crime is widely regarded as not so much against a person as against society as a whole. The killing of George Woehrle has aroused public anger, especially because of the kind of man he was, and because of the nature of his assigned duty. Police Chief Jack O'Keefe described the slain officer as 'probably the most patient, understanding man we have.' He had cultivated patience and understanding in years of dealing with Stockton's children in trouble in both official and off-duty relationships. We undertake to speak for the entire community in expressing sympathy to Patrolman Woehrle's family and to his friends and colleagues in the Police Department.''

[9]Penal Code, section 1073, states that actual bias is ''the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party.''

The situation here is manifestly unlike that in *People* v. *McKay* (1951), 37 Cal.2d 792, 794 [3], 800 [236 P.2d 145], upon which defendant particularly relies. The circumstances there which required change of venue of a trial for murder are described in this court's opinion as follows: "The decedents were well known, popular officers of a small county. Defendants were strangers with bad reputations. The homicides were given extensive and continuing publicity in the local newspaper. . . . The accounts of the crime emphasized the fact that defendants had confessed. At the time of the crimes the community was thoroughly aroused, there was talk of lynching, and defendants were taken to the state prison for safekeeping." No member of the county bar was sufficiently unprejudiced to conduct the defense, "local feeling [was] so intense that the presentation of defendants' case [was] impeded, members of the jury [were] familiar with the facts in advance of the trial and [were] aware of the intense antagonism of the community toward defendants, and the regular trial judge [had] forcefully presented his opinions as to the merits of the case and attacked the good faith of defense counsel."

On retrial in another county the *McKay* defendants were again found guilty of first degree murder but the sentence was life imprisonment whereas at the first trial the death penalty was selected. (*California Death Penalty* (1958), 11 Stan.L.Rev. 94, 104, fn. 21.)

In the case at bench the trial judge's determination that the printed and broadcast publicity did not affect the fairness of the trial must be upheld. Although "it is conceivable that even accurate publications during or preceding a trial may effect a breach of due process," it is true also that whether publications, accurate or inaccurate, warrant reversal depends on whether defendant has shown that they had a prejudicial effect. (*People* v. *Gomez* (1953), 41 Cal.2d 150, 161 [258 P.2d 825].) Here, as in *People* v. *Mendes* (1950), 35 Cal.2d 537, 542 [1] [219 P.2d 1], the reports concerning the case "appear to be no different from the usual reporting of any homicide of this sort [i.e., the killing of a popular police officer]." (See also *People* v. *Stroble* (1951), 36 Cal. 2d 615, 620-621 [3] [226 P.2d 330], affd. *Stroble* v. *California* (1952), 343 U. S. 181, 193-195 [72 S.Ct. 599, 96 L.Ed. 872, 882-883].)

In addition to the previously stated facts as to the veniremen's acquaintance with and opinions of the case, and

the allowance of 40 challenges for actual bias in this regard, the following matters bear on defendant's contentions that the trial judge should have allowed his challenges of certain individual prospective jurors for cause and should have permitted him to exercise more than 20 peremptory challenges: Defendant successfully challenged one venireman for actual bias because of his prejudice against the plea of not guilty by reason of insanity. Sixteen jurors were excused because they had conscientious scruples against capital punishment.[10] The trial judge disallowed defense challenges for actual bias of eight prospective jurors who had tentative opinions of defendant's guilt or believed that they would be influenced against defendant because the victim was a police officer, but whose *voir dire* examination indicated that they could set aside these views, accord defendant the presumption of innocence, and rest their decision only on evidence adduced in court.[11] Defendant exercised peremptory challenges against these eight veniremen.

 Another peremptory challenge was used by defendant, after denial of challenge for cause, to excuse a juror who testified that he spoke only German until he was 9 years old and that although he now spoke principally English he had difficulty understanding some of defense counsel's questions. (Some of the questions were not altogether clear in their wording; also the record shows that the acoustics in the courtroom were poor.) The trial judge said, "I have listened

---

[10]Penal Code, section 1074, subdivision 8, provides as one ground of challenge for implied bias: "If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror." This language is construed to exclude jurors conscientiously opposed to the death penalty from trying any case where the punishment could be (even though it need not be) capital. Otherwise on the trial of the issue of guilt the possibility of ultimate selection of the death penalty might affect the deliberations of a juror who was opposed to capital punishment but who would have had no other conscientious objections to finding defendant guilty of first degree murder, and on the trial of the issue of penalty such juror could not make the requisite unfettered choice. (See *People* v. *Riser* (1956), 47 Cal.2d 566, 573-576 [305 P.2d 1], particularly hn. [3]; Jewel, *The Death Penalty* (1961), 36 State Bar J. 228.)

[11]Penal Code, section 1076, provides that "[N]o person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public journals, circulars, or other literature, or common notoriety; provided, it appear to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters to be submitted to him."

574

to the juror answer questions here now for 20 or 30 minutes and it seems to me he understands the English language well enough.'' This venireman, examined by defense counsel, further testified as follows:

''Q. . . . [W]*herever a . . . man is charged with the killing . . . in which the law permits the death penalty, would you be inclined without any evidence then to feel that the death penalty was the proper penalty . . .?* A. Yes. Q. Now, this case involves a charge of murder, it involves the charge of kidnap with intent to commit robbery. Do you feel now . . . that the death penalty is the appropriate penalty in this case? A. No, I couldn't tell that.'' (Italics added.) The prospective juror had testified at the beginning of his examination that he had read of the case but had no opinion; that ''I can't form any opinion as long as I don't know what it's all about.'' Although the affirmative answer to the italicized question seems to indicate a willingness to impose the death penalty under a mere charge of murder, without evidence, the venireman's other answers show his understanding that his decision as to guilt should and would await and rest on the evidence adduced at the trial. The trial judge's resolution of any conflict in the prospective juror's testimony is binding on the appellate court. (*People* v. *Daugherty* (1953), 40 Cal.2d 876, 890 [14] [256 P.2d 911].)

The trial judge's refusal to allow defendant more than 20 peremptory challenges was proper. Section 1070 of the Penal Code provides that ''If the offense charged be punishable with death, or with imprisonment in the state prison for life, the defendant is entitled to twenty and the state to twenty peremptory challenges.'' Peremptory challenges are, in effect, arbitrary challenges. Defendant has given us no reason to doubt that the Legislature has the power to fix the number of such challenges. The discretion of the trial judge in the allowance of challenges for cause, and the recuse of prospective jurors for cause on his own motion, covers a broad field. Here the judge appears to have been alert to exercise his broad discretion in a manner fair and reasonable to both parties.[12]

---

[12]Examples of the trial judge's informed exercise of his discretion are the following:

Questioned only by the judge, venireman Wood said that he had an opinion of defendant's guilt and doubted whether he could set it aside. ''THE COURT: Do you think, then, that you would consider a man's liberty on the basis of gossip and hearsay and you would disregard the sworn testimony and the law as given you by the Court, is that your

Furthermore, it does not appear that there was particular difficulty in obtaining an impartial jury. The fact that the time consumed in selecting a jury was as great as that consumed in trying the case and reaching the verdicts, was not due to lack of suitable veniremen but rather to the method of selection adopted by the trial court and counsel, especially the repetitive questioning by counsel for defendant.

For the reasons above stated the judgment and order appealed from are affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.

---

attitude? JUROR WOOD: Possibly. THE COURT: Alright. MR. JAMES: [defense counsel]: Interpose a challenge—— THE COURT: He is not fit to be a juror. MR. JAMES: (Continuing) ——for stated actual bias. (Whereupon Juror Wood left the jury box.)''

Questioned only by the judge, venireman Edmonson said that he had formed an opinion. ''THE COURT: You would try to remove it if the evidence required you to do it, would you not? JUROR EDMONSON: I would try, but—— MR. JAMES: I'll interpose a challenge for cause. THE COURT: Very well, he will be excused. He would be a conscientious juror with an opinion.''

After considerable questioning by defense counsel, venireman Utz said that he did not believe he could give defendant a fair trial and counsel challenged for cause. ''THE COURT: Well now, Mr. Juror, let's look into that. You first started out by saying you have no opinion in the case at all. Now, you end the examination by saying you don't think you could give the Defendant a fair and impartial trial. Why not? You have no opinion whatsoever and you say you would be governed by the evidence and by the law and yet you say you don't think you could give the Defendant a fair and impartial trial. What is the reason for that? Is it because your mind is so occupied with something else that you don't think you could keep your mind on the case if you were selected? JUROR UTZ: Yes, sir, that is what I am trying to say. THE COURT: Yes. Well, if that is the reason why, I think—— you have challenged him. He will be excused for that reason.''