[Crim. No. 18237. Second Dist., Div. Five. May 19, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD DALE JONES, Defendant and Appellant.

## COUNSEL

Robert E. Burke, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby and Edward A. Hinz, Jr., Chief Assistant Attorneys General, William E. James, Assistant Attorney General, Robert R. Granucci, Alan V. Hager, Donald J. Oeser and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—The only real question on this appeal is whether on the basis of defendant's offer of proof in support of his motion to quash the jury venire, he should have been permitted to offer evidence that the jury panel from which the trial jury was about to be drawn was illegally constituted. ■ We hold that the trial court erred in foreclosing defendant's offered proof. Nothing in this opinion must be construed as a holding or dictum to the effect that the composition of defendant's trial jury was, in truth, the result of an unconstitutional selection process.[1]

### FACTS

An information charging defendant with the murder of one Melvin Washington, Jr., was filed on July 3, 1968. Defendant pleaded not guilty. On November 29, 1968, defendant, through his counsel, the

---

[1]We take judicial notice of the fact that several trial courts in Los Angeles County have held the type of hearing which was denied to defendant. At least two appeals pending in this division resulted from convictions which followed full factual hearings on the issues raised by defendant.

public defender, filed a written motion ". . . for an order to quash the complete jury venire for the Southern Judicial District of Los Angeles County on the ground that through the inexorable operation of a system, large and disproportionate numbers of economically oppressed, the educationally disadvantaged and culturally different, black people and Mexican-Americans in particular, have been excluded so that to try defendant with jurors from such venire would violate the due process clause of the Fourteenth Amendment of the United States Constitution."[2]

Before defendant's motion came on for hearing, his attorneys filed an extensive memorandum of points and authorities in support thereof. This memorandum discussed what the defense considered to be the law applicable to the facts which it expected to prove in support of its motion. Obviously, however, it was not drafted as a formal offer of proof.

When the motion was called for hearing the parties agreed that while the United States Constitution required California to provide some forum in which a motion such as defendant's could be brought, our statutes made no such provision; however section 1059 of the Penal Code does allow a challenge to the panel on certain narrowly defined grounds and section 1061 of the same code permits the prosecution to "except" to the challenge, if the sufficiency of the facts alleged as ground for the challenge be denied. (See *People* v. *Carter,* 56 Cal.2d 549, 568-569 [15 Cal.Rptr. 645, 364 P.2d 477].)

The parties further agreed that the "exception" provided for by section 1061 was, in legal effect, a demurrer to the challenge. The parties then

---

[2]At no point during the extensive arguments in the trial court did the prosecution claim that defendant's motion relied on the wrong clause of the Fourteenth Amendment and that it should have been based on an alleged violation of equal protection. While it is undeniably true that most cases arising out of state prosecutions in which there has been a claim of discriminatory jury selection have discussed the problem from the point of view of the equal protection clause (e.g., *Swain* v. *Alabama,* 380 U.S. 202, 203-204 [13 L.Ed.2d 759, 763-764, 85 S.Ct. 824]), there is language in certain Supreme Court opinions, which suggests very strongly that the problem is also one of due process. (*Ballard* v. *United States,* 329 U.S. 187, 195 [91 L.Ed. 181, 186, 67 S.Ct. 261]; *Glasser* v. *United States,* 315 U.S. 60, 85-86 [86 L.Ed. 680, 707, 62 S.Ct. 457]; *Smith* v. *Texas,* 311 U.S. 128, 130 [85 L.Ed. 84, 86, 61 S.Ct. 164].) It is, of course, obvious why it was the fashion to invoke the equal protection clause when the right to trial by jury itself had not yet been recognized as inherent in due process. Since the recognition of the right to jury trial as one fundamental to the American scheme of justice and therefore a part of the rights guaranteed by the due process clause (*Duncan* v. *Louisiana,* 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444]) an excellent argument can be made that in cases of alleged discrimination in the selection process of the venire, reliance on the equal protection clause has become unnecessary. (See Comment, *Grand Jury Discrimination and the Mexican American,* 5 Loyola L.A. L.Rev. 87, 119-120, fn. 196; Note, *The Jury: A Reflection of the Prejudices of the Community,* 20 Hastings L.J. 1417, 1435-1440.)

stipulated further that any facts referred to in defendant's memorandum as part of the expected proof could be considered "as part of the pleadings." This stipulation was made in the middle of a legal argument which does credit to both sides and consumes about 80 pages of reporter's transcript. At the end of the argument, when the court indicated that it was going to sustain the legal position of the prosecution, the defense moved successfully, by analogy to the second sentence in section 1062 of the Penal Code,[3] to amend the motion by inserting certain words. As finally submitted to the court, on the prosecution's renewed "exception," the amended motion was one for an order to quash the venire "on the ground that through the *intentional, systematic,* inexorable operation of a system" certain segments of the population had been excluded from the venire, the italicized words "intentional" and "systematic" having been added by the amendment. The amended motion was immediately denied and the parties proceeded to trial.

Defendant was acquitted of the charge of murder, but convicted of manslaughter.

On his appeal defendant raises several points concerning the admissibility of evidence. They do not require discussion. In part they are answered by the intervening decision in *California* v. *Green,* 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930]. Other contentions raise problems connected with the prosecution's attempt to prove a premeditated murder. The conviction of voluntary manslaughter makes these problems academic. (*In re McCartney,* 64 Cal.2d 830 [51 Cal.Rptr. 894, 415 P.2d 782].)

### THE PROFFERED EVIDENCE

Defendant's memorandum indicates that, if permitted to do so, his attack on the jury venire would have been twofold. First, he offered to submit what he deemed to be sufficient statistical evidence that certain practices pursued in the selection process eliminated a disproportionately large number of qualified black[4] persons from consideration for or placement

---

[3]Section 1062 of the Penal Code: "If, on the exception, the court finds the challenge sufficient, it may, if justice requires it, permit the party excepting to withdraw his exception, and to deny the facts alleged in the challenge. *If the exception is allowed, the court may, in like manner, permit an amendment of the challenge."* (Italics added.)

[4]Defendant is black. It is, however, part of his argument that he need not show that he is a member of any cognizable minority against which the jury selection process discriminates. He refers us to several decisions from other jurisdictions and United States Supreme Court dicta which are to the effect that a showing of standing as a member of the discriminated segment of the eligible population is not necessary

on the venire, to place the burden of justifying the practices on the prosecution's shoulders. (*Whitus* v. *Georgia,* 385 U.S. 545, 552 [17 L.Ed. 2d 599, 605, 87 S.Ct. 643]; *Avery* v. *Georgia,* 345 U.S. 559, 562 [97 L.Ed. 1244, 1247, 73 S.Ct. 891]; cf. *Montez* v. *Superior Court,* 10 Cal. App.3d 343, 348 [88 Cal.Rptr. 736]; see generally Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases,* 80 Harv.L.Rev. 338.) Second, defendant offered to prove, without merely seeking the benefit of the shifting of any burden, that one of the practices employed in the selection of the jury venire, a certain written vocabulary test, necessarily discriminated against black prospective jurors.

## THE STATISTICAL PROOF

The homicide with which defendant was charged took place in Long Beach. Under applicable local rules the trial was held in the South District of the Los Angeles Superior Court and the prospective jurors were drawn from that district. (Code Civ. Proc., § 206; Los Angeles Sup. Ct., rules 17, § 1 and 19, § 2.) The statistics submitted therefore relate entirely to the south district.

There were four practices which, from a statistical point of view, allegedly discriminated against blacks to such an extent that the burden of proving their constitutional validity was cast on the prosecution. They were: 1. the use of a certain written "competence" test; 2. the exclusive selection of prospective jurors from the list of registered voters; 3. the

before one may attack discriminatory jury selection. In California a requirement of standing has been announced by the Supreme Court. (*People* v. *White,* 43 Cal.2d 740, 753 [278 P.2d 9]; see also *Ganz* v. *Justice Court,* 273 Cal.App.2d 612, 620 [78 Cal. Rptr. 348].) While it is certainly arguable that the constitutional doctrine announced in *Duncan* v. *Louisiana,* 391 U.S. 145 [20 L.Ed.2d 491, 88 S.Ct. 1444] makes the rule requiring standing a thing of the past, we shall assume that defendant was under an obligation to prove standing. To be more precise, we shall ignore alleged discrimination against members of the Mexican-American community and against "economically oppressed" persons, except to the extent that a disproportionate number of blacks may be poor. The manner of the Supreme Court's disposition of an issue not decided in the recent *Alexander* v. *Louisiana* (1972) 405 U.S. 625 [31 L.Ed.2d 536, 92 S.Ct. 1221], may be of significance. The petitioner, a male Negro, secured a reversal on the basis of systematic discrimination against jurors of his race. He had also complained of a statutory exemption from grand jury duty for women who do not volunteer therefor. The court noted that the petitioner might have some difficulty in establishing an equal protection claim on behalf of a sex to which he did not belong. His due process argument was shunted aside, at least temporarily, by noting that the Fourteenth Amendment has never been interpreted to demand grand jury proceedings in the states (*Hurtado* v. *California,* 110 U.S. 516, 538 [28 L.Ed. 232, 239, 4 S.Ct. 111, 292]), which makes the *Duncan* due process approach unapplicable to grand jury selection procedures.

ease with which wage earners, particularly blue collar workers, found it possible to be excused from jury service; and 4. the failure of the Los Angeles County Superior Court to institute any follow-up procedures when a prospective juror failed to respond to the initial notice to report for an interview.

### The Competence Test

The relevant portion of defendant's offer on that point reads as follows:

"Defendant will introduce this evidence: that, in a white middle-class area of Long Beach, 13% of those taking the test during the 1968 draw failed; that in the largely black area of central Long Beach 48% failed. . . ."

### Use of List of Registered Voters

On this point the memorandum reads as follows:

"Based on data supplied by the Long Beach and Los Angeles City Planning Departments, defendant will introduce the following evidence:

"In a white middle-class section of Long Beach, surrounding California State College at Long Beach and comprised by census tracts 5745, 5748 and 5749, there were in 1968 approximately 11,522 persons 21 years and over (57%) out of the estimated population of 20,215. As of April 7, 1967, there were approximately 8991 registered voters. (This is the net summary listing closest in time to the date when the registered voter list was used in the 1968 draw, May 19, 1967). Therefore, about 78% of the population presumably eligible to vote is registered.

"The section of central Long Beach comprised by census tracts 5732, 5733, 5752, and 5753 is approximately 55% black. Out of a 1968 estimated population of 20,185, there were about 13,423 persons 21 and over. As of April 7, 1967, there were approximately 5,747 registered voters. Thus, about 43% of those eligible are registered."

### The Economic Hardship Excuse

On this point the memorandum offers the following proof:

"Defendant will introduce evidence showing that of the persons from the three low-income, minority-group areas studied who responded to the Jury Commissioner's summons, 22% (40 out of 180) were excused for economic hardship. In the white, middle-class area, 12% (25) of those responding (206) were excused for hardship. . . ."

## The "No Responses"

On this last point defendant offered the following:

"The percentage of people throughout the South District who do not respond to the letter sent by the Jury Commissioner is extreme. In the white, middle-class area studied, 35% (109 out of 315) did not respond.

"Defendant will introduce evidence showing that in low-income, minority-group areas the majority of people sent notices do not respond. In the black section of central Long Beach, 58% (64 out of 110) did not respond. . . ."

## Summary of Statistical Proof

With respect to black citizens on the south district approved juror list for 1968, defendant proposed the following proof:

"From the white, middle-class section of Long Beach, out of about 11522 persons 21 and over, 83 were placed on the approved juror list. . . .

"The rough boundaries of the black community are: Atlantic Avenue on the West, Willow Street on the North, Walnut Street on the East, and 10th Street on the South. In this region, the Long Beach Planning Department estimates that there are 14,500 black people. The number of persons 21 and over is 8,700. From the precincts strictly within the above boundaries, notices were sent to 110 persons. Out of them, 12 were placed on the approved list. From precincts immediately adjacent, 17 were approved. Defendant's investigator has located all 29, and by observation,[5] determined that 5 are Negro. It will be remembered that out of 11,522 persons 21 and over in the white, middle-class section, 83 ended up on the approved list.

"The 8700 figure is 76% of 11522. 76% of 83 is 63. Thus, if the selection had been proportionate, 63 black people from the central area would have been placed on the approved list. 63 divided by 5 is 13 (12.6). Therefore, the percentage of the eligible population taken from

---

[5]In California one of the problems faced by blacks who seek to prove a prima facie case of discrimination from the composition of the venire that results from whatever selection process is employed appears to be that our officials are very properly colorblind and do not keep records based on race. In this respect jurisdictions with a history of de jure discrimination are more accommodating. (See e.g., *Whitus* v. *Georgia*, 385 U.S. 545, 551-552 [17 L.Ed.2d 599, 604-605, 87 S.Ct. 643]; *Norris* v. *Alabama*, 294 U.S. 587, 592-593 [79 L.Ed. 1074, 1078-1079, 55 S.Ct. 579].)

the middle-class white section was 13 times as great as the percentage from the black area."

## The Merits of the Written Competence Test

The offered proof must be viewed in the light of the statutory command that, to be competent to act as a juror, a person must be "of ordinary intelligence." (Code Civ. Proc., § 198, subd. 2.)

If we correctly understand the thrust of defendant's attack on the written test of juror competence, it is basically twofold: first, the test is irrelevant to the criterion of intelligence; second, the test—whatever it does measure—discriminates against prospective jurors of the lower socio-economic strata which, of course, contain a disproportionately large number of black citizens.

It appears from the record that the test consists of two parts, one a reading comprehension test and the other a vocabulary test. If the prospective juror fails either test, he is disqualified.

No sample of the reading competence test was submitted to the trial court. With respect to that portion of the test defendant contents himself with making a legal argument to the effect that the requirement of subdivision 3 of section 198 of the Code of Civil Procedure that a juror must be "[p]ossessed of sufficient knowledge of the English language," does not demand an ability to read. On this point we entirely agree with the court in *Ganz* v. *Justice Court*, 273 Cal.App.2d 612, 623 [78 Cal.Rptr. 348], that we must have "jurors who are fully able to understand spoken and written English." Defendant relies on *People* v. *Davis*, 4 Cal.Unrep. 524 [36 P. 96]. There the defendant complained that a challenge for cause with respect to a juror who testified on *voir dire* that he could understand and read English "pretty well," but could not "write much," but who also admitted that he could not always understand "what anyone says when they speak in English," was erroneously disallowed. The Supreme Court held that it was proper for the trial court to determine the qualifications of the juror after "seeing him and hearing him talk." That is a far cry from a holding that persons who cannot read English nevertheless qualify under section 198.

The record does contain a sample of the vocabulary test. This is a

multiple choice test. It contains twenty-five words, each with four possible equivalents. The examinee is asked which of the four choices is the correct one.[6]

Submitted to the court as "material" in support of the defendant's motion was an article from the Journal of Verbal Learning and Verbal Behavior.[7] The gist of that article is that as a result of many recorded conversations with certain test groups, the author had found that only 9,699 English words were used in those conversations, of which 4,097 were used only once. The words in question are listed in an appendix

---

[6]Herewith the test in its entirety:

| "   | 1 | 2 | 3 | 4 | |
|---|---|---|---|---|---|
| 1 *fraud* | deceit | remark | wife | flood | ( ) |
| 2 *involve* | implicate | wrong | ruin | turn around | ( ) |
| 3 *credible* | unbelievable | estable | estimated | believable | ( ) |
| 4 *acquit* | refuse | meditate | discharge | go away | ( ) |
| 5 *plaintiff* | arraignment | one who brings suit | overseer | evidence | ( ) |
| 6 *allege* | assert | to own | reduce | reflect | ( ) |
| 7 *intent* | application | purpose | service | extent | ( ) |
| 8 *larceny* | large opening | theft | Swedish | market | ( ) |
| 9 *trustee* | leader | orphan | traitor | a safe keeper | ( ) |
| 10 *ratify* | select | import | approve | rate | ( ) |
| 11 *valid* | highly valued | having legal force | perfect | uncertain | ( `) |
| 12 *proper* | appropriate | ordinary | respectful | expert | ( ) |
| 13 *impute* | prefer | impure | to ascribe or credit | prove | ( ) |
| 14 *legacy* | to delegate | operation | bequest | loan | ( ) |
| 15 *assign* | sign | bring into | lessen | make over to | ( ) |
| 16 *accede* | donate | rise up | agree | excel | ( ) |
| 17 *expend* | terminate | pay out | detest | grow longer | ( ) |
| 18 *justify* | warrant | expect | to reprove | fortify | ( ) |
| 19 *immoderate* | trustworthy | temporal | ashamed | to excess | ( ) . |
| 20 *provoke* | put together | catch | remove | to cause | ( ) |
| 21 *malice* | sadness | force | unpleasant | ill will | ( ) |
| 22 *marital* | judged | military | referring to marriage | reduced to rank | ( ) |
| 23 *apprehend* | apprise | seize | rob | precede | ( ) |
| 24 *waive* | give up | move violently | make note of | march | ( ) |
| 25 *duress* | overcome | length | existence | compulsion | ( )" |

[7]D. Howes, *A Word Count of Spoken English* (1966) 5 Journal of Verbal Learning and Verbal Behavior, pages 572-604. We do not suggest that the trial court was bound to take judicial notice of the correctness of the conclusions by the author of the article. We gather that it was submitted as illustrative of the type of expert evidence defendant offered to produce.

to the article. Of the 25 words in the vocabulary test, 18 are not among the 9,699 words listed.[8] Three appear only once.[9]

Defendant proposed to call as his witness Professor Warren of the University of Southern California, who had devised the test in the thirties. At that time he had correlated it with the I.Q.'s of several hundred students at the university and established a minimum passing grade to correspond with an I.Q. of 90. He has, however, no records of that minimum passing grade.[10] While the test may at one time have been an accurate measure of "ordinary intelligence" for middle-class examinees, it is no longer valid for any socio-economic group. In any event, Professor Warren's purpose was to construct a test of average verbal ability, which would not exclude anyone of ordinary intelligence. The reason why the test vocabulary consisted mostly of legal words was to make the test appear relevant and "motivating" to the prospective jurors. The test was not intended to exclude more than 3 percent of prospective jurors. The total fail rate for the south district in 1968, however, was 22 percent. There apparently has never been any reevaluation of the test in spite of the ethnological changes in the district since World War II.

Furthermore, the offer of proof continues, the ability to pass a vocabulary test is more related to the social and economic opportunities previously enjoyed by the examinee than to intelligence, a quality which is evidenced, in part, by a capacity to learn words, rather than actual knowledge.

## DISCUSSION

As already noted (fn. 1, *supra*), the question of the validity of jury selection procedures employed in Los Angeles County at the time relevant to this appeal[11] is pending in this court in other cases, in which the superior court conducted a full hearing on the merits. Since we are anxious not to prejudice these other cases in which certain of the problems raised here are factually and legally more fully explored, we dispose of the case at bar on the narrowest but most cogent ground: the clearly erroneous holding that the offer of proof was insufficient even with respect to the vocabulary test.

---

[8]Fraud, credible, acquit, plaintiff, allege, larceny, trustee, ratify, impute, accede, immoderate, provoke, malice, marital, apprehend, duress, expend, waive.

[9]Legacy, justify, intent.

[10]The practice of the jury commissioner was to fail a prospective juror who correctly answered fewer than 17 of the questions.

[11]We understand that certain changes are now in effect.

In failing to discuss the legal significance of the statistical evidence offered with respect to the other alleged discriminatory practices, we do not deny that the proposed proof is plausibly adequate to place the burden of justifying the practices on the People. It is merely that raw statistical data without expert interpretation can be extremely misleading and have, on occasion, provoked demonstrably erroneous statements by appellate courts.[12] We hope that we assume correctly that at any renewed challenge to the venire, the parties will offer expert testimony with respect to the significance of the statistical data or, at least, furnish the court with sufficient information and help so that it may take judicial notice of their meaning. (Evid. Code, § 452, subd. (h).)

Nevertheless we consider, but only in conjunction with the other evidence on the point, the statistics submitted with respect to the vocabulary test results. Whatever may be their significance, when viewed in a vacuum, they certainly reinforce the rest of the evidence offered on the subject of the vocabulary test which evidence, in turn, gives meaning to the statistics.

First, there is the test itself which appears questionable on its face. We assume that there is nothing wrong in such a test containing a fair share of words whose meaning is primarily of legal significance. It is, however, apparent that in this particular test familiarity with words of legal significance is stressed almost to the point of excluding all others and that the test seems designed to eliminate persons whose interests and day-to-day contacts have nothing to do with the law. Indeed the proposed testimony from the author of the test was that he used legal words because he wanted it to be relevant and motivating.

Further, the nature of some of the legal words seems to be such that persons in the higher economic brackets would naturally be more familiar with them. Words such as "trustee," "ratify," "legacy" or "assign" are

[12]See, for example, *Swain* v. *Alabama*, 380 U.S. 202, 208-209 [13 L.Ed.2d 759, 766, 85 S.Ct. 824] and compare with Note, 75 Yale Law Journal 322, 326, footnote 22. After the correct mathematical approach to statistical evidence in jury discrimination cases was explained in Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases*, 80 Harvard Law Review 338, the United States Supreme Court's approach became a lot more scientific and accurate. Thus in *Whitus* v. *Georgia*, 385 U.S. 545, 552, footnote 2 [17 L.Ed.2d 599, 605, 87 S.Ct. 643], it noted that by the application of the Finkelstein formulae the mathematical probability of the particular jury list containing only seven Negroes on a venire of 90 was .000006. Recently in *Alexander* v. *Louisiana* (1972) 405 U.S. 625 [31 L.Ed.2d 536, 92 S.Ct. 1221], the court again employed what it called "one statistical technique of calculating probability" and approved the petitioner's demonstration that the chances of the particular black-white distribution involved in the case having been the result of a random selection procedure were one in 20,000.

bandied about more frequently in stockbrokers' offices than on construction sites or in factories and unemployment lines.

Third, some of the correct equivalents appear culturally biased, at least without further proof that they are not. Thus, while we have no doubt that modern English as spoken in black neighborhoods contains a synonym for "impute," we seriously doubt that it is "ascribe" or "credit"—words more commonly encountered in legal opinions or in the conversation of university faculty members given to somewhat precious usage.

Finally, we draw attention to the total absence of any questions or answers which would counterbalance the apparent cultural slant of those that were actually asked. The particular suggestions are perhaps wrong or facetious, but why is the examinee asked to define "fraud" rather than "con," "larceny" rather than "ripoff"? Why is the correct answer to "acquit" not "cut loose" but "discharge"? When these considerations are buttressed by the proposed testimony from Professor Warren concerning the circumstances attendant on the creation of the test, its highly suspect verification against a limited test group, the lack of any reevaluation, its obvious failure to eliminate only those whom the statute eliminates[13] and, above all, its apparent relation to social and economic opportunities, rather than intelligence, we must hold that the proposed evidence would have been sufficient to support a finding of discrimination and that there was a case for the People to answer.

The main thrust of the People's argument to the contrary is to the effect that the test is neutral as far as race is concerned, that underrepresentation of blacks is merely a consequence of efforts to obtain qualified jurors and that the proposed evidence would not have supported a finding that any discrimination was intentional or systematic.

It may well be that the selection procedures were designed to screen out potentially unqualified jurors. However, when that is done by discriminating against large segments of the population by using a test which is not designed to measure their ability to make good jurors, the selection procedures are constitutionally invalid, at least where the defendant who challenges them is a member of a segment against which the discrimination is directed. (See fn. 4, *supra*.)

The point that defendant did not offer to prove that the discrimination

---

[13]We cannot assume that 48 percent of the eligible residents of a black neighborhood are below "ordinary intelligence." (Code Civ. Proc., § 198, subd. 2.)

was intentional or systematic assumes that he had the burden of showing that those responsible for advising and administering the selection procedures were racists, bent on keeping jury boxes white with, at most, token representation by blacks.

Of course defendant never offered to prove anything of the kind; further, we hope that it would have been futile for him even to try. That is, however, not the end of the problem.

The People advanced a similar argument in *Carmical* v. *Craven,* 457 F.2d 582, a federal habeas corpus matter arising out of a California state conviction and involving an attack on a so-called "clear thinking" test given to prospective jurors in Alameda County. There, too, the People argued that the proposed proof did not show purposeful discrimination. This was the court's reply:

"The object of the constitutional mandate is to produce master jury panels from which identifiable community classes have not been systematically excluded. The object is neither to reward jury commissioners with good motives nor to punish those with bad intentions. When a jury selection system actually results in master jury panels from which identifiable classes are grossly excluded, the subjective intent of those who develop and enforce the system is immaterial. For example, in Norris v. Alabama, *supra,* 294 U.S. at 598, 55 S.Ct. 579, 584, the Court related testimony by jury officials that they had not considered race or color in preparing the jury roll. The Court then observed:

" 'If, in the presence of such testimony as defendant adduced, the mere general assertions by officials of their performance of duty were to be accepted as an adequate justification for the complete exclusion of Negroes from jury service, the constitutional provision—adopted with special reference to their protection—would be but a vain and illusory requirement.'

"(*Accord,* Turner v. Fouche (1970) 396 U.S. 346, 361, 90 S.Ct. 532, 24 L.Ed.2d 567; Sims v. Georgia (1967) 389 U.S. 404, 407-408, 88 S.Ct. 523, 19 L.Ed.2d 634; Hernandez v. Texas, *supra,* 347 U.S. at 481-482, 74 S.Ct. 667; Smith v. Texas, *supra,* 311 U.S. at 131-132, 61 S.Ct. 164.) The lack of specific intent to discriminate on the part of Alameda County's jury officials cannot offset the grossly discriminatory effect of their jury selection process. (*Cf.* Griggs v. Duke Power Co. (1971) 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 [footnote omitted]; Gaston County v. United States (1969) 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.

2d 309; Gomillion v. Lightfoot (1960) 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110.)" (457 F.2d at p. 587.)

We therefore feel bound to hold that on his proposed showing, defendant was entitled to a hearing.

The judgment is reversed.

Stephens, J., and Aiso, J., concurred.

A petition for a rehearing was denied June 2, 1972, and respondent's petition for a hearing by the Supreme Court was denied July 12, 1972.