[Crim. No. 16970. Second Dist., Div. Five. June 20, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
EDDIE LEE JOHNSON et al., Defendants and Appellants.

12

**COUNSEL**

Richard H. Levin, William B. Offner, Gerald T. Manpearl, Carl L. Cain and Carl E. Jones, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P. J.**—Eddie Lee Johnson, Ronald King, Charles Preston Smith, Vernice Lee Thomas and Shirley Ann Clark appeal from convictions on some of the counts which were included in a nine-count indictment.

The trial on counts I, II and III of the indictment was severed from the trial of the remaining counts, IV through IX. The convictions from the second trial led to the appeal in *People* v. *Johnson* (2d Crim. No. 19739), filed concurrently, but not published.

The chart appearing in the footnotes sets forth, with respect to each count, the crime charged, the defendant's name, the victim and the result of the proceedings with respect to each defendant.[1]

This opinion will discuss issues arising out of proceedings which took

1

| Count | Crime | Victim | Defendants Charged | Result |
|-------|-------|--------|--------------------|--------|
| I | Murder 5-13-68 | Bryant | Johnson | Guilty (2nd degree) |
| | | | King | Not Guilty |
| | | | Smith | Not Guilty |
| | | | Thomas | Not Guilty |
| | | | Clark | Not Guilty |
| II | Robbery 5-13-68 | Sterling | Johnson | Guilty (1st degree) |
| | | | King | Guilty (1st degree) |
| | | | Smith | Guilty (1st degree) |
| | | | Thomas | Guilty (1st degree) |
| | | | Clark | Guilty (1st degree) |
| III | Kidnapping 5-13-68 | Sterling | Johnson | Dismissed |
| | | | King | Dismissed |
| | | | Smith | Dismissed |
| | | | Thomas | Dismissed |
| | | | Clark | Dismissed |
| IV | Robbery 5-10-68 | Moss | Johnson | Guilty (1st degree) |
| | | | King | Guilty (1st degree) |
| V | Kidnapping 5-10-68 | Moss | Johnson | Dismissed |
| | | | King | Dismissed |
| VI | Robbery 4-8-68 | Nakamoto | King | Not Guilty |
| VII | Robbery 4-11-68 | Leong | Johnson | Mistrial |
| | | | King | Mistrial |
| | | | Thomas | Guilty (1st degree) |
| VIII | Robbery 5-2-68 | Jorgensen | King | Mistrial |
| | | | Thomas | Mistrial |
| IX | Kidnapping 5-2-68 | Jorgensen | King | Dismissed |
| | | | Thomas | Dismissed |

place before the severance of counts IV through IX, together with claimed errors committed during the jury trial on counts I, II and III.

Before the jury trial started, defendants unsuccessfully challenged the composition of the grand jury which had indicted them and the panel of the petit jury which was about to try them. The trial court's rulings with respect to each challenge are claimed to have been erroneous.

### The Challenge to the Grand Jury

Some of the arguments made by some of the defendants with respect to grand jury proceedings in general—such as denial of the right to confront witnesses—are so patently misaddressed to this court, that we assume they are advanced only for presentation to the Supreme Court. We therefore do not discuss them.

Defendant Clark claims, in addition, that the particular grand jury which indicted her was improperly constituted because inadequate steps were taken to determine whether any of the members of the grand jury were serving as trial jurors while sitting on the grand jury (Pen. Code, § 893, subd. (b)(1)) or had been discharged as grand jurors by any court within the past year. (Pen. Code, § 893, subd. (b)(2)).

The People contend that the procedures to determine whether the grand jurors were competent under the provisions of section 893 of the Penal Code, were adequate. They are probably correct, but this is not the point. The challenge to the grand jury was not an inquest into the efficiency of the superior court and its staff. The important fact is that defendants did not even claim—let alone prove—that any incompetent person actually served on the grand jury.

Clark further claims that the grand jury was unrepresentative of the community because section 894 of the Penal Code, which relates to grand jurors, incorporates by reference the exemptions and excuses set forth in sections 200, 201 and 202 of the Code of Civil Procedure, which relate to trial jurors.

The exact claim thus advanced—for which no authority is cited—was rejected in *Zelechower* v. *Younger* (9th Cir. 1970) 424 F.2d 1256, 1259.

Finally Clark claims that the absence of a mandatory requirement that all the judges of the superior court submit annual nominations for the grand jury, lessens the likelihood that the grand jury will be truly representative of all people in the county.

Just why that should be so is not explained. Obviously, for better or

for worse, the superior court judges do not represent the kind of cross-section of the community which is either required or at least desirable with respect to the composition of a grand jury. (Cf. *Montez* v. *Superior Court,* 10 Cal.App.3d 343 [88 Cal.Rptr. 736].) It is anybody's guess whether a mandatory requirement that all superior court judges submit names would result in more diversification.

The challenge to the grand jury had no merit.

### The Challenge to the Petit Jury

■ While the challenge to the grand jury was relatively casually made, the attack on the petit jury panel was elaborately presented.

The thrust of the attack was that certain procedures of the Los Angeles County Superior Court result in a panel from which persons of defendants' class—members of minorities, the socially and economically underprivileged—were systematically excluded.

Under specific attack came three aspects of the selection process: 1. the fact that the prospective jurors are drawn exclusively from the list of registered voters; 2. the payment of $5.00 a day per diem; and 3. the use of the written competence test, partially described in *People* v. *Jones,* 25 Cal.App.3d 776, 783-785 [102 Cal.Rptr. 277].

The proof was extensive, particularly with respect to the written competence test.[2] When it was all in, however, one essential element of defendants' case was lacking: proof that the selection procedures, in application, actually resulted in underrepresentation of any particular group of potential jurors.[3]

---

[2] In view of the result we reach, extensive comment on defendants' presentation is unnecessary. As far as the use of voter registration lists as the sole source of jurors is concerned, *People* v. *Sirhan,* 7 Cal.3d 710, 749-750 [102 Cal.Rptr. 385, 497 P.2d 1121] appears dispositive. With respect to the challenge based on the $5.00 per diem allowance, the proof did not differ substantially from that found insufficient in *People* v. *Milan,* 9 Cal.3d 185, 195-196 [107 Cal.Rptr. 68, 507 P.2d 956]. Defendants' strongest point—indeed, the one to which the lion's share of the presentation was devoted—was the alleged discriminatory effect of the written competence test. The evidence offered with respect to the nature of the test, was more or less along the lines of the offer of proof which we held to have been erroneously rejected in *People* v. *Jones, supra,* 25 Cal.App.3d 776, though, of course, the prosecution scored a few points on cross-examination of the various defense witnesses. All the same, since, as we shall show, defendants failed to prove that the effect of the test was as its experts surmised, no extended discussion of the evidence is necessary.

[3] Obviously we need not discuss what evidence, if any, was offered on the issue of whether the practices under investigation amounted to intentional discrimination, as that concept was understood in *People* v. *Jones, supra,* 25 Cal.App.3d at pp. 787-788. If there was any intent to discriminate, defendants did not prove that it succeeded.

■  The fact that defendants failed to prove that the selection procedures actually resulted in underrepresentation of identifiable groups, was virtually conceded in the trial court. Here, the issue is intertwined with another claim of error raised before us: that the trial court abused its discretion in not allowing defendants a continuance to present that very evidence.

This is what the record shows: The indictment was filed on May 29, 1968. On July 3, not guilty pleas were entered after the denial of motions under section 995 of the Penal Code. The record does not indicate just when defendants advised the court that they would challenge the petit jury panel. It is, however, clear that no later than November 26 it was known that such a challenge would be made. On December 3, when the challenge and other pretrial motions were to be heard, the attorney for defendant Johnson—who had the laboring oar with respect to the challenge and was speaking for all defendants—advised the court that a similar challenge was being tried before Judge Peracca in department 71 "in the *Smith* and *Powell* cases." (See *Smith* v. *Superior Court,* 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65]; *People* v. *Powell,* 67 Cal.2d 32 [59 Cal. Rptr. 817, 429 P.2d 137].) He further stated that "all the statistical material and, I'd say, the large bulk of exhibits to be used in my challenge are in that court." Argument on the *Smith-Powell* challenge in Judge Peracca's court was anticipated "this week." Judge Peracca had advised counsel that he would not release the exhibits until he had ruled on the challenge.[4]

·On the basis of this showing the hearing on the challenge was continued[5]

---

[4]Counsel continued: "It is absolutely essential that in the presentation of the motion that exhibits be brought over. I think the course—and, timewise, it would be prohibitive to try to duplicate it. They have all the jury interview forms and the test forms that particular jurors filled out for the jury panel now in existence, namely the [1968—2 panel]. They have the same material on the [1968—1] jury panel. They have taken all these information off the forms of the Jury Commissioner's forms and have placed it on IBM cards and have run them through computers, so it would be impossible to duplicate the matter because everything is in that court.

"Thus, it is impossible at this time to—for me to proceed on the motion. I intend to, as soon as I can, obtain the information, to sit down with [the prosecutor] and go over it with him, and to see if it would be possible for him to stipulate to some of the material. I don't know what I will stipulate to or what will be necessary that we'll have to have testimony on, but I do intend to try to make it as brief as possible, namely, in court time, but I want certain things to be presented to the Court."

[5]During the December 3 hearing defense counsel advised the court that a written challenge to the panel would be filed. That was done on December 11, 1968. For what it is worth, we point out that the only basis for the challenge specified in the written motion is the "use of the voters' registration lists without supplementation." This does not comply with section 1060 of the Penal Code, as far as the challenge

"until pertinent exhibits are available." On December 11, 1968, there were further pretrial proceedings, with respect to other problems. It appears that everybody knew that the hearing before Judge Peracca had not been concluded.[6] The court then expressed understandable impatience, referred counsel to section 1050 of the Penal Code,[7] and noted that "the hoped-for use of exhibits" from the *Smith-Powell* hearing was not to be reasonably expected. Defense counsel argued that the challenge should keep on trailing the conclusion of that hearing,[8] although it had become even more difficult to predict when it would be over, because Judge Peracca had become "sick with the Hong Kong flu." In the course of his argument defense counsel announced: ". . . It is impossible to proceed or present

on other grounds is concerned. However, attached to the motion was a lengthy memorandum of points and authorities which did discuss the other bases for the challenge.

[6]Counsel for defendant Smith argued that the case should be tried on the merits first, to be followed by a challenge to the jury in case his client got convicted. His program was found unacceptable.

[7]Section 1050 of the Penal Code reads in pertinent part as follows: "The welfare of the people of the State of California requires that all proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time, and it shall be the duty of all courts and judicial officers and of all prosecuting attorneys to expedite such proceedings to the greatest degree that is consistent with the ends of justice."

[8]"Your Honor, just to make my position clear for the record, I'll say this: In the *Smith* and *Powell* case, they have attacked the selection of the jury system, stating that it is systematic exclusion of minorities and lower social economic groups by means of this examination.

"In the motion, they have subpoenaed and have in court the original forms filled out by the jurors. They have all the cards, all the information from the forms on IBM cards which are the property of the Jury Commissoner of Los Angeles County. That is in the courtroom. IBM cards were made from jurors that were rejected and that is in the courtroom. The cards were then run through a computer. Computer tapes are in the courtroom. It would be impossible to even duplicate the material that is in the courtroom. This is my problem. I have told Mr. Beckler that and the other attorneys that I will be ready, willing, and able to go as soon as I can get my hands on that material, because it cannot be obtained any place else. 48 hours after that material is released by Judge Peracca, I'm ready to go.

"The rest of my motion, if you want to use the statistical material, is one-third— one-third will be testimony by experts and another third will be law. The law part I can argue to the Court. I don't need any time on that. That may take an hour or so.

"But at least one-third of my presentation is the presentation of the statistics and analyzing the draw of this past year.

"Now, if I can get a stipulation as to that material which is in evidence in 72, that cuts down the presentation that I will make in this court. Then it's limited to maybe two or three expert witnesses, and that's it.

"This is why I said that it shouldn't take that long. The majority of the time spent in the *Smith* and *Powell* case was merely getting the material. The last four or five months they have been taking the cards and running them through computers. There has been a tremendous amount of wasted time in just obtaining the statistical material which we don't have to do."

any statistical material to show exactly the percentage of black, brown, and lower socio-economic whites excluded from the jury system—from the jury panel in this County without that statistical evidence presented."

After everybody had had his say, the court set the challenge to the panel for hearing on January 6, 1969.

Witnesses were heard on January 6, 7, 8, 9, 10, 13, and 14. In the meanwhile the hearing in the *Smith-Powell* case had still not concluded. On January 15 defense counsel moved for an order directed to Judge Peracca "to release certain exhibits so that they can be used in this court."[9] The motion was denied. Counsel then requested a continuance. His remarks are quoted in the footnote.[10] Counsel was, however, unable to request a continuance to a date certain, because he was unable to predict when the *Smith-Powell* hearing would conclude.

During the discussion which followed, the prosecutor stipulated that the material in Judge Peracca's courtroom was "very, very voluminous, consisting of thousands, if not tens of thousands, of documents." The court, of course, made it clear that it was not precluding the defense from offering further testimony. To make a long story short, the continuance was denied and the challenge was argued on what evidence there was. It, too, was denied.

We cannot hold that the trial court abused its discretion in denying a continuance.

---

[9] According to the reporter's transcript, the exhibits counsel wanted were listed on a three-page document which was handed to the court. We have not been able to locate the list.

[10] ". . . At this time I would then request a continuance. Your Honor, we have had numerous experts testify in this case, and they have set forth their opinions as to exactly what percentage of the population would fail this exam the way it is constructed. *I think it is essential that as part of my case I show to your Honor exactly what the exam does, or did, in a particular draw, 68-2.*

"As the Court knows, Mr. Goodwin said that to his knowledge our office was the first one since 1937 or '37 to ever do any statistical analysis of the results.

"As the Court knows, the *Smith-Powell* case is in progress on this same issue. Also, there is another matter, which I have the court number of, another matter in the same area, where the same challenge is being made by our office, but using the Long Beach area, and that is People vs. Jones, Superior Court case No. A-003,164.

"In that case, your Honor, it is my information that 50 per cent of the Negroes taking the exam failed, and that though the population of Long Beach, the population of individuals with Spanish surnames, is larger than the white population, there were only two individuals in the 68-2 draw on the jury panel with Spanish surnames.

"I think that with the testimony offered I should be allowed to show statistically what was done with this test in a period prior to the time of the challenge when one could say this would be the normal inferences of what was occurring with this particular exam. Thus, for that reason, I would ask for the continuance." (Italics added.)

The evidence shows conclusively that the problem of proof with which counsel was presented was the result of the superior court and its employees believing what they read in the United States Supreme Court reports, and being color-blind in its practices and record keeping. Therefore no data with respect to the effect of its procedures on minority representation on jury panels were available. In *People* v. *Jones, supra,* 25 Cal.App.3d 776, the panel was a relatively small one—the case involved a branch court—and the number of blacks chosen for jury duty was determined by observation. Apparently that was impossible in the central district and for some reason never made quite clear by the record, computer tapes and thousands of documents had to be produced in order to prove that certain color-blind procedures had, in practice, a discriminatory effect.

The trouble with defendants' position in this case is that they really made no adequate showing that they needed the "tens of thousands" of documents which Judge Peracca would not release. It is beyond belief that the parties in *Smith-Powell* expected the court to retire with a mountain of computer tapes and punched cards in order to determine the composition of the jury panel. Common sense tells us—and must have told the trial court—that somebody in Judge Peracca's court was going to summarize the raw data and come up with some simple figures. There was no showing that evidence of the general result of the computer investigation conducted in *Smith-Powell* was not available for presentation in this case. Section 1509 of the Evidence Code provides that such a general result could have been presented without production of the original writings from which it was compiled.[11] Naturally, it would have had to be produced for inspection by the adverse party, if demanded. No such demand was made, because the general result was never offered and, presumably, because another prosecutor in Judge Peracca's court representing the same adverse party knew perfectly well what the records contained.

The trial court did not abuse its discretion in denying the challenge to the petit jury panel.

We proceed to consider alleged errors in connection with the trial on the merits.

---

[11]Section 1509 of the Evidence Code reads as follows: "Secondary evidence, whether written or oral, of the content of a writing is not made inadmissible by the best evidence rule if the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole; but the court in its discretion may require that such accounts or other writings be produced for inspection by the adverse party."

FACTS

The broad outline of facts which follows will be augmented, from time to time, in connection with our discussion of particular errors claimed.

The robbery and murder charges against all five defendants arose out of one incident at a dress shop at 6617 South Western Avenue, owned by Lelia Mae Sterling, some time after 3 p.m. on May 13, 1968.

All the defendants, along with two juveniles, Alfreda and Diane Embry, arrived in the vicinity of the shop on Western Avenue in two cars. King, Smith and the Embry girls were riding in a beige Ford. Clark, Johnson, and Thomas were in a Cadillac. King, Johnson, Clark, Smith and Alfreda Embry eventually entered the dress shop while Thomas and Diane Embry remained outside in the car. Both cars were then in the alley behind the dress shop. After other customers had left, Johnson grabbed Mrs. Sterling and put something small and hard to her back. He later testified that this was a gun.

Mrs. Sterling was taken to the rear of the store and tied with a cord. A plastic bag was put over her face and her head was covered with a small rug. In response to a question she revealed where the keys to the back door were kept and where her purse was.

In the meantime, Oscar J. Bryant, a police officer, who was taking a burglary report in the next block, was summoned by a neighboring shop-keeper because of his suspicions about the cars in the alley.

After Bryant entered the store the two women, defendant Clark and Alfreda Embry, ran out of the door. The officer came out backwards, with gun drawn, followed by three men with their hands up. The men were Johnson, King and Smith. He lined them up against a store window. A nearby shopkeeper was asked to call for aid on the police car intercom.

A gun battle then began in which Bryant was killed and Johnson and Smith were wounded. Johnson was arrested a little later in a nearby shed. The revolver which killed the officer was recovered. King was arrested hiding nearby. Smith was found sitting or lying on the sidewalk near the scene of the shooting. Thomas and Clark were evidently not arrested until some time later.

After the events a cardboard box which had been empty before the defendants entered the store, was found full of dresses near the rear door of the store.

## DISCUSSION

As noted earlier (see fn. 1, *supra*) all defendants were found guilty of first degree robbery. Johnson alone was convicted of second degree murder. The other four defendants were acquitted on the murder count.

Not all defendants make the same contentions on appeal, although some are, of course, duplicated. We shall discuss them defendant by defendant, leaving the thornier problems until the end. We will not repeat discussions on points found to be without merit. .

█ *Clark's Contentions:* Clark claims that the trial court erroneously instructed the jury that if it found any defendant guilty of robbery "it is robbery in the first degree as a matter of law."

Her argument is not, as one might suppose, that Johnson's robbery of Mrs. Sterling was not in the first degree—she admits that such a contention would be futile—but is based on the lack of evidence that she herself was armed. Her conviction was, however, based on the theory that she was Johnson's accomplice or coconspirator. The instruction was therefore proper. (*People* v. *Perkins,* 37 Cal.2d 62, 64-65 [230 P.2d 353]; *People* v. *Day,* 71 Cal.App.2d 1, 5 [161 P.2d 803].) Her reliance on section 1203 of the Penal Code is obviously beside the point.

*King's Contentions:* King makes several contentions dealt with elsewhere in this opinion. Unique to his position is an argument that he should not have been found guilty of first degree robbery, because there were so many accomplices that "their number would seem to indicate that no weapon would be necessary." This is fortified by an argument that the victim, Mrs. Sterling, complied with Johnson's demands when something was poked in her back, which object was not revealed to her as being a gun until she had been robbed. No citation of authorities is required to refute this point.

█ King also claims that the murder count should have been dismissed as to him under the provisions of section 995 of the Penal Code. Here the argument is that while there may have been evidence of a conspiracy to rob Mrs. Sterling, the homicide of Officer Bryant was committed only by Johnson.

The grand jury transcript is not before us. We therefore cannot hold that King's motion to dismiss the indictment under section 995 was improperly denied. We can, however, say with assurance that his legal argument has no merit. Once it is conceded that he and Johnson were

engaged in a conspiracy to rob Mrs. Sterling,[12] it is quite immaterial whether homicide was part of the common plan. (*People* v. *Martinez,* 239 Cal.App.2d 161, 178 [48 Cal.Rptr. 521].) The fact that King was acquitted on the murder charge is, of course, irrelevant.

*Thomas' Contentions:* Thomas makes various contentions unique to his appeal. He claims: 1. that his conviction is based on the uncorroborated testimony of an accomplice, Diane Embry; 2. that he was denied effective representation because his attorney did not cross-examine Diane; 3. that his conviction is not supported by substantial evidence even if Diane was not an accomplice; and 4. that the court misdirected the jury in its definition of "reasonable doubt."

■ It was the People's contention at trial that Thomas was a participant of the robbery, though he never entered the dress shop. The major portion of the evidence relating to Thomas was, indeed, the testimony of Diane as to his activities during and shortly after the robbery. The trial court, in its instructions, left it to the jury to determine whether Diane was an accomplice. A review of the evidence convinces us that the court was correct. Even if Diane was found to be an accomplice, corroboration was ample. Thomas' argument that the record does not support his guilt, has no merit.

The only evidence which tends to indicate that Diane knew of a plan to rob the store is that she was with the defendants and overheard their conversations before the robbery, that she saw a rifle on Thomas' lap before the robbery and that she observed Thomas acting suspiciously after the others entered the store. Whether or not this would be sufficient to support a charge against her, it is certainly insufficient to require a finding that she was an accomplice. (*People* v. *Robinson,* 61 Cal.2d 373, 398-399 [38 Cal.Rptr. 890, 392 P.2d 970]; *People* v. *Jones,* 228 Cal.App.2d 74, 93-95 [39 Cal.Rptr. 302].)

There was sufficient corroborating evidence, in the event the jury found that Diane was in fact an accomplice. She had testified that after the other defendants left the cars in the alley, Thomas had a rifle on his lap, pointing it out of the slightly opened door of the Cadillac; that after driving around

---

[12]One of the strongest points against King with respect to the conspiracy theory is that before Johnson and Smith entered the store, King went down the racks and turned hanger hooks so that they all faced in the same direction. Originally they had faced in opposite directions to make it difficult to remove more than one hanger at a time.

the block and parking, Thomas left the rifle on the floor of the car; and that when Thomas saw the commotion around the front of the dress shop, apparently after the shooting, he said to Diane "shut up and act normal" and walked the other way.

This evidence tended to show Thomas' guilty knowledge of a predetermined plan to rob the store, and some participation therein. It was substantially corroborated by the police's discovery of the loaded rifle on the floor of the Cadillac, and by the observation by one Officer Pickens of Thomas, shortly after the shooting, approaching the Cadillac, opening the door, leaning into the car, but closing the door and walking away when he saw the officer across the street.

The contention that Thomas' attorney was ineffective because he did not cross-examine Diane—except to establish that she was 16 years old—has no merit. Thomas speculates on how an extensive cross-examination could have impeached the witness. The record before us contains nothing to support his contention. We must assume that counsel knew what he was doing and wanted to get a damaging witness off the stand as quickly as possible.

Thomas' final contention that the instruction on the People's burden of proof, which followed the mandate of section 1096 of the Penal Code by referring to a "moral certainty," is vague, has been so often rejected that further discussion is useless. (*People* v. *Wade*, 15 Cal.App.3d 16, 25-26 [92 Cal.Rptr. 750].)

■ *Smith's Contentions:* Smith makes a strong argument with respect to the sufficiency of the evidence to convict him of robbery. A detailed statement concerning the evidence concerning him is set forth in the footnote.[13]

---

[13]Diane Embry testified that Smith arrived in the alley behind the dress shop in the beige Ford with King, Alfreda Embry, and herself. The Cadillac arrived at about the same time. *Everyone except Thomas got out of the cars and held a conversation which Diane could not recollect.* The only weapon she saw was a rifle on Thomas' lap in the Cadillac. Clark said that she was going into the store to get some dresses and would come out the back door. Diane then got into the Cadillac with Thomas. The others went around the corner, out of the alley.

Mrs. Sterling, the owner of the dress shop, testified that sometime after 3 p.m. on the day of the robbery King, Clark and Alfreda entered the shop. Alfreda went behind the partition to try on a dress. King went down the racks turning the hanger hooks so they faced all the same direction.

After other customers left the shop, Johnson and Smith entered. Smith was standing by the counter, near the front door, and Johnson was further into the store. When Mrs. Sterling turned around Johnson grabbed her. Johnson told Clark to close the front door, which she did.

A witness identified Smith as one of the three men leaning against the liquor store

Although the question is extremely close, we think that from the totality of the evidence the jury was entitled to infer that Smith entered the store with Johnson to be as helpful as he could be in the planned robbery. There is no compelling evidence in the record which would explain his presence in a women's dress shop on any other basis. The fact that the record contains no evidence that his aid was needed, is immaterial, once it is believed that he was a member of the criminal conspiracy.

■ *Johnson's Contentions:* The most serious contention made by Johnson is that the trial court erred in instructing that second degree felony murder could be based on the crime of assault with a deadly weapon, as the underlying felony. This instruction concededly violated the rule announced in *People* v. *Ireland,* 70 Cal.2d 522, 539 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].[14]

Under all of the circumstances of this case, we believe that the error was not prejudicial. Factually a rather clear-cut conflict was presented to the jury. It was the People's case that Johnson suddenly fired at Officer Bryant when he, Smith and King, were lined up against a store window with their hands up. Johnson's defense was that when he was thus in Bryant's power, Bryant, without provocation, fired first and that he, Johnson, merely reacted by firing back. Realistically, therefore, the only question was whether Johnson's theory of having shot in self-defense created a reasonable doubt.

To be sure, the court did instruct on manslaughter and a theoretical argument can be made that this case comes within the doctrine announced in *People* v. *Kopp,* 275 Cal.App.2d 38, 41-42 [79 Cal.Rptr. 601], where *Ireland* error was held to be prejudicial, although there was no defense of diminished capacity (cf. *People* v. *Fain,* 70 Cal.2d 588, 598 [75 Cal.

---

window, with their hands up, being held at gun point by the policeman who was later shot. He testified that, after the shooting began, Smith was shot in the ankle or leg by a second policeman, that he seemed to be afraid and confused, and that he was the last of the three to attempt to run. He fell after only a few feet, and remained sitting or lying on the sidewalk until more police arrived. He had his hands up during the time of the shooting.

A palm print matching that of Smith was found on the glass counter in the dress shop, and his fingerprints were found on a rear fender of the Cadillac.

Defendant Johnson testified that Smith was not involved in the robbery, which was a spur-of-the-moment crime he committed when Clark—his wife—picked out dresses for which he could not afford to pay. He happened to be carrying a gun.

[14]By a quirk of unfortunate timing *Ireland* was filed about a week before the jury was instructed. Evidently the case had not even reached the advance sheets. The error was, however, discussed at some length in connection with Johnson's motion for a new trial. The trial court held it to have been nonprejudicial. As will appear, we agree.

Rptr. 633, 451 P.2d 65]), because the error relieved the jury of the burden of finding malice. The difference between this case and *Kopp* is that there a manslaughter verdict was a distinct possibility, justified by the underlying facts—defendant and the victim were rivals for the affections of the same woman—while here manslaughter instructions were obviously given only out of an excess of caution.[15]

Johnson also argues that the evidence was insufficient to convict him of murder, because the People offered no evidence that he did not act in self-defense: "i.e. that the officer did not fire first while [Johnson] was lined up by the liquor store window." That simply is not so. While none of the witnesses who testified that the first shot was not fired by Officer Bryant left the witness stand without being impeached in some fashion, there was ample evidence that the shooting was started by Johnson.

The judgments, and each of them, are affirmed.

Stephens, J., and Kingsley, J.,* concurred.

The petition of appellant Johnson for a hearing by the Supreme Court was denied August 16, 1973.

---

[15]The People make the additional point that assault with a deadly weapon, as defined by the trial court, actually included the element of malice because the court instructed that "in the crime of assault with a deadly weapon there must exist in the mind of the perpetrator the specific intent to commit a violent injury, and unless such intent so exists that crime is not committed." Without deciding or belaboring the point, it seems to us that the People contend for a dilution of the concept of malice, which is not justified by the authorities.

*Assigned by the Chairman of the Judicial Council.