Filed 4/25/13  P. v. Bucio CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARIA LISSETTE URENA BUCIO,<br><br>    Defendant and Appellant. | 2d Criminal No. B232504<br>(Case No. 2008046598)<br>(Ventura County) |

Maria Lissette Urena Bucio (Bucio) appeals her convictions for second degree robbery and murder and the resulting 25 year-to-life prison sentence.  She argues that the trial court erred in allowing the prosecutor to excuse an African-American juror, in several of its evidentiary rulings, and in instructing the jury regarding accomplices.  Because Bucio's challenges do not individually or collectively constitute reversible error, we affirm.

*FACTS AND PROCEDURAL HISTORY*

I. *The Crimes*

On a Saturday morning in mid-August 2008, Gurmohinder Singh (Singh) walked out of the U.S. Bank in Oxnard, California.  He was carrying a black bag containing $100,000 cash that he had just withdrawn for his check-cashing business.  Jeffrey Aguilar (Aguilar) approached Singh, shot him several times, grabbed

the black bag, and fled on foot with a stream of cash trailing behind him. Singh died minutes later on the floor of the bank's lobby.

A few days earlier, Aguilar had met with Bucio, his aunt. Bucio knew Singh. She knew that Singh and his partners owned several check-cashing businesses. She knew that owners of such businesses needed to withdraw large amounts of cash (because she owned one herself). She knew that Singh banked at the U.S. Bank in Oxnard. She knew that Aguilar was a member of the Colonia street gang. In the garage of her home, Bucio discussed with Aguilar how to "get[] money" from an "Arabian guy" who "owned a couple of stores."

A day or two later, Aguilar enlisted his friend and fellow Colonia gang member, Mario Cervantes (Cervantes), to drive him to the U.S. Bank in Oxnard. They parked facing the bank's entrance. Aguilar called Bucio, and then waited inside the car. A half hour later, Singh's business partner arrived. Singh drove up minutes later. Both are Indian. Uncertain which of the two Indian men was his intended victim, Aguilar called Bucio. Bucio arrived at the bank minutes later. Bucio entered the bank and soon thereafter walked out of the bank with Singh and his partner. As they exited, Bucio signaled to Aguilar—through a flip of her hair and an exaggerated smile— which man was Singh. Aguilar called Bucio three times immediately thereafter.

Bucio then informed Aguilar that the robbery would occur the next morning—not a week later, as they had originally discussed. Aguilar arranged for Cervantes to help him get a gun and for Aguilar's girlfriend, Christina DeLeon (DeLeon), to be his getaway driver.

On the morning of the robbery, Bucio stayed away from the U.S. Bank in Oxnard. But she was close by, and called both Aguilar and the bank just minutes after the robbery.

## II. *The Prosecution*

The grand jury indicted Bucio, Aguilar, Cervantes, DeLeon and others. The indictment charged Bucio with second-degree robbery (Pen. Code, § 211) and

murder (§ 187).[1]  It also alleged that the murder occurred in the course of a robbery (§ 190.2, subd. (a)(17)), and that Bucio aided and abetted a felony with reckless indifference to human life (*id.*, at subd. (d)).

Following severance, Bucio proceeded to trial in February 2011.  At the conclusion of the seven-week trial, the jury found Bucio guilty of robbery and murder.  The jury also found that the murder occurred in the course of the robbery, but did not find true the reckless indifference allegation.

The trial court sentenced Bucio to 25 years to life on the murder conviction, and stayed the five-year sentence on the robbery count pursuant to section 654.

*DISCUSSION*

I. *Jury Selection*

Bucio argues that the prosecutor unconstitutionally exercised a peremptory challenge against Juror 11, an African-American woman.  (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled on other grounds in *Johnson v. California* (2005) 545 U.S. 162, 164.)  Because the trial court invited the prosecutor to justify the strike, our review is confined to evaluating the prosecutor's reasons for dismissing that juror.  (*People v. Mills* (2010) 48 Cal.4th 158, 174 (*Mills*).)  Bucio argues that the trial court's evaluation of the prosecutor's reasons was too general to deserve deference.  (*People v. Silva* (2001) 25 Cal.4th 345, 385-386; *People v. Lenix* (2008) 44 Cal.4th 602, 627 (*Lenix*).)  We need not resolve this issue because Bucio's claim lacks merit even if we accord the trial court no deference.

A. *Pertinent Facts*

Juror 11 is an African-American woman.  In her questionnaire and during voir dire, Juror 11 indicated that she had been racially profiled, mistreated, and accused of transporting drugs in a "really recent" encounter with a police officer.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

3

Although she stated she could be fair, she said she felt "violated" by the encounter, which made her cry at the time and which "still bothers" her and "brings up emotion." She never filed a complaint against the officer.

When the prosecutor sought to exercise her ninth peremptory challenge against Juror 11, Bucio objected. The trial court found no prima facie evidence of discrimination, but invited the prosecutor to explain her reasons for the strike. The prosecutor offered two. First, she noted that Juror 11 was the victim of a "very recent" incident involving a police officer who was "threatening," "aggressive" and "rude," and which "visibly upset" her. Second, the prosecutor stated she wanted a juror who would "hold the People's witnesses to high standards," and did not want a juror "who is going to give anybody a pass for misconduct, whether that be an officer, a civilian or another individual"; the prosecutor feared Juror 11 fell into the latter camp because she never filed a complaint against the officer. The trial court evaluated "the subjective genuineness of the prosecutor's reasons" and found them to be "neutral, genuine and not pretextual."

B. *Analysis*

Bucio challenges the trial court's finding that the prosecutor acted for group-neutral reasons. Bucio claims the prosecutor's stated reasons are belied by: (1) the prosecutor's decision not to strike Juror 4 who, but for race, was "almost the mirror image" of Juror 11; (2) the prosecutor's decision not to strike Jurors 5 and 10 who, but for race, had similar negative prior encounters with law enforcement; and (3) the "ludicrous and pretextual" nature of the prosecutor's stated reason because no prosecutor would want "every juror . . . to hold the People's witnesses to high standards."

Our task is to determine whether the trial court abused its discretion in concluding that the prosecutor did not act with "purposeful racial discrimination." (*Mills*, *supra*, 48 Cal.4th, at pp. 173, 175.) A prosecutor's reasons need not support a challenge for cause, and they may be trivial, arbitrary or idiosyncratic; however, they must be race-neutral. (*Id.*, at p. 176.) We ask whether this prosecutor *actually* relied

4

upon discriminatory or non-discriminatory reasons. (*People v. Thomas* (2011) 51 Cal.4th 449, 474; *Miller-El v. Dretke* (2005) 545 U.S. 241, 252.)

Our inquiry into the prosecutor's subjective reasons looks to the prosecutor's actual statements and to circumstantial evidence of her motivations. (*Lenix*, *supra*, 44 Cal.4th, at pp. 625-627.) We can examine the facial plausibility of any proffered reasons to see whether they "give[] rise to an inference of discriminatory intent. [Citations.]" (*Snyder v. Louisiana* (2008) 552 U.S. 472, 482, 485.) We can also test the veracity of a prosecutor's reliance on her proffered reasons by examining whether she left on the jury other jurors who, but for race, gender or other protected attribute, were indistinguishable from the excused juror. But we must tread carefully with such "comparative juror analysis" because it gives little weight to "the legitimate subjective concerns 'that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar [on the cold record].' [Citation.]" (*People v. Arias* (1996) 13 Cal.4th 92 136, fn. 16, quoting *People v. Johnson* (1989) 47 Cal.3d 1194, 1120; *Mills*, *supra*, 48 Cal.4th at p. 177.)

Bucio's proffered comparative juror analyses do not support an inference that the prosecutor acted with discriminatory intent. Although Juror 4 was similar in age, marital status and educational achievement to Juror 11, only Juror 11 had a negative prior experience with law enforcement. This is a legitimate distinction, and a viable basis for exercising a peremptory challenge. (*People v. Turner* (1994) 8 Cal.4th 137, 171 (*Turner*).) Jurors 5 and 10 had negative past experiences with law enforcement, but their experiences were markedly different than Juror 11's. Juror 5's experience was far less severe than Juror 11's; he was upset with an officer who, following a "recent" traffic accident, was more "chummy" with the other involved driver and was uninterested in completing an accident report. The severity of Juror 10's experience was on par with Juror 11's, but significantly more remote in time; he was arrested for refusing to leave the lobby of a police station 20 years earlier. Because these two jurors' experiences with law enforcement did not share the same

recency and severity as Juror 11's, the prosecutor's decision not to excuse these other jurors does not give rise to an inference of discriminatory animus.

Bucio's challenge to the prosecutor's stated reasons is also without merit for two reasons. First, the prosecutor's second reason—which Bucio asserts was the only reason—is not so implausible on its face as to be pretextual. Bucio asserts that no lawyer would rationally want jurors to hold its witnesses to high standards. But Bucio's assertion fails to place the prosecutor's comment in the broader context of her concern that Juror 11's willingness not to file a complaint against the officer who mistreated her might translate into a willingness to give "anyone" (including, ostensibly, the defendant) a similar "pass for misconduct."

Second, Bucio's argument completely ignores that the prosecutor gave another reason for the strike—namely, Juror 11's "recent" and "traumatic" interaction with law enforcement. Even if we were to assume that the prosecutor's concern about Juror 11's possible willingness to overlook misconduct by others was pretextual, the prosecutor's concern about Juror 11's negative feelings about law enforcement is sufficient by itself to uphold the challenge. *Batson* and *Wheeler* prohibit a strike made "solely" for discriminatory reasons. (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.) The courts are divided over the appropriate test to apply in cases where a prosecutor's motives are a mix of legitimate and discriminatory reasons. Some uphold a strike as constitutionally valid as long as the prosecutor would have exercised the strike for the legitimate reason alone. (E.g., *Wallace v. Morrison* (11th Cir. 1996) 87 F.3d 1271, 1274-1275). Others will uphold the strike only if the prosecutor was not "*motivated in substantial part by discriminatory intent . . . .*" (E.g., *Cook v. Lamarque* (9th Cir. 2010) 593 F.3d 810, 814-815.) We need not decide between the standards because the prosecutor's actions in this case are valid under either test.

6

## II. *Evidentiary Challenges*

### A. *"Other Acts" Evidence*

Bucio assigns error to the trial court's admission of three categories of evidence of her "other acts": (1) Bucio's financial distress; (2) her banking practices; and (3) her involvement in an illegal enterprise to purchase and resell stolen goods. We review for an abuse of discretion the admission of "other acts" evidence under Evidence Code sections 1101, subdivision (b), and 352. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329 (*Foster*).)

#### 1. *Pertinent Facts*

In a pretrial motion, the People sought to admit evidence that (1) the financial health of Bucio's personal accounts and her check-cashing business had declined precipitously in the year before the robbery; (2) Bucio had started trafficking in stolen goods with Javier Chavez (Chavez) just months immediately prior to the robbery; and (3) Bucio had solicited Edgar Vasquez (Vasquez), Aguilar's friend and fellow gang member, to rob Chavez soon after the robbery charge in this case.

The trial court ruled this evidence admissible as "other acts" evidence under Evidence Code section 1101, subdivision (b). The court concluded that Bucio's dire financial condition was "inextricably connected" with her involvement in the stolen goods ring, and that together they were relevant or establish her motive to commit robbery. The court also ruled that Bucio's solicitation of a second robbery was relevant to prove her intent in the charged case and as proof of a common scheme or plan. The court found all of this evidence to have a "substantial relevant value" and to lack any "serious danger of undue prejudice, of confusing the issues, or of misleading the jury." The court reserved judgment on the precise purposes for which the jury would be able to consider the evidence.

At trial, the court admitted four categories of "other acts" evidence. First, the court received evidence that, as of August 2008, Bucio had outstanding personal debts of $1 million from mortgages, auto loans and credit cards; that she was indebted to her friend George Manwani for $25,000; and that she was with increasing

frequency cashing checks at her check-cashing business that later bounced (financial difficulty evidence).  Second, a U.S. Bank employee testified that Bucio regularly moved money between her four accounts and her MoneyGram wire transfer account; that she "kited" checks by depositing checks and withdrawing money against those checks before they cleared; that she would ask for and often receive special favors and treatment; and that she was financially "savvy" (banking practices evidence).  Third, Chavez testified that Bucio in April 2008 started advancing him money to buy stolen goods; that Bucio recruited her friends and family to participate; that he ended up stealing $90,000 from Bucio and nearly $300,000 from Bucio's friends and family; and that he still owed Bucio $45,000 (stolen merchandise evidence).  Fourth, the trial court admitted evidence that, soon after the U.S. Bank robbery, Bucio invited Vasquez to her garage and there asked him to rob a man who owed her money (ostensibly, Chavez) and warned him not to kill Chavez so he could still repay his debts (second robbery evidence).

The trial court instructed the jury that this evidence could be considered to establish Bucio's motive, intent and common plan or scheme—and for no other purpose.  In closing argument, the prosecutor argued that the financial difficulty and banking practices evidence were relevant, not to show Bucio's motive, but rather to show that she is a savvy and manipulative person capable of manipulating Aguilar to do her bidding.

### 2.  *Analysis*

#### a.  *Financial difficulty evidence*

Bucio argues that the trial court abused its discretion in admitting the financial difficulty evidence to prove her motive to engage in the robbery.

As a general matter, "'[e]vidence of a defendant's poverty or indebtedness, *without more*, is inadmissible to establish motive for robbery or theft . . . .'"  (*People v. Clark* (2011) 52 Cal.4th 856, 929 (*Clark*), italics added.)  For over a century, our Supreme Court has held that "reliance on poverty alone as evidence of motive is deemed unfair to the defendant, and the probative value of such evidence

8

is considered outweighed by the risk of prejudice.  [Citation.]"  (*People v. Wilson* (1992) 3 Cal.4th 926, 939; *People v. Kelly* (1901) 132 Cal. 430, 432.)  Put differently, the link between poverty and proclivity to steal is an impermissible one that is deemed to violate Evidence Code section 352 as a matter of law.

That impermissible link is not implicated in this case.  The trial court did not admit evidence of Bucio's "'. . . poverty or indebtedness, *without more . . . .*" (*Clark*, *supra*, 52 Cal.4th at p. 929.)  Instead, the financial difficulty evidence was "inextricably connected" with the stolen merchandise evidence, and was relevant to prove Bucio's involvement on the theory that a person defrauded in an illegal enterprise is more likely to resort to illegal acts (e.g., robbery) than a person whose debts arise from lawful activity because she lacks legal avenues of recourse.  Because this reasoning does not rest on the impermissible inference that poor people are more likely to steal, it does not run afoul the Evidence Code section 352-based bar to evidence of poverty or indebtedness to prove motive.

b.  *Banking practice evidence*

Bucio next contends the banking practices evidence was irrelevant and more prejudicial than probative under Evidence Code section 352.  This evidence demonstrated Bucio's level of sophistication and savvy, which was relevant to rebut her assertions of naiveté and to establish her skill at manipulating others, including her nephew, Aguilar.  (Accord, *People v. Fields* (1998) 61 Cal.App.4th 1063, 1071 [evidence of defendant's sophistication with drugs admitted to prove identity]; *People v. Stewart* (2004) 33 Cal.4th 425, 485 [evidence of defendant's manipulation of others admissible in murder case to prove motive and intent to kill].)  This evidence does not, as Bucio contends, violate the rule against using indebtedness to prove motive because it is not offered to prove motive and because many of her banking practices pre-date her recent indebtedness.  This evidence was also not unduly prejudicial because some of Bucio's practices were characterized by witnesses as common and others as "unusual," but no practice was ever labeled "illegal."

9

c. *Stolen merchandise evidence*

Bucio further argues that the trial court abused its discretion under Evidence Code sections 1101, subdivision (b), and 352, in admitting the stolen merchandise evidence to prove her motive, her intent, and a common scheme or plan. Her arguments lack merit.

Bucio first contends that the stolen merchandise evidence impermissibly uses her poverty or indebtedness to prove motive. (See *Clark*, *supra*, 52 Cal.4th at p. 929.) Because, as we discuss above, the trial court admitted this evidence in conjunction with the financial difficulty evidence, the rule and rationale of *Clark* are inapplicable.

Bucio next asserts that the stolen merchandise evidence is inadmissible to prove intent because (1) her intent is not at issue; and (2) this evidence is too dissimilar from the charged robbery to shed any light on her intent to commit robbery. We disagree.

Although a defendant's not guilty plea puts all elements at issue (*People v. Carpenter* (1997) 15 Cal.4th 312, 379, superseded on other grounds by § 1054), the nature of the charged acts can sometimes render "other acts" evidence cumulative and hence inadmissible under Evidence Code section 352. (*People v. Balcom* (1994) 7 Cal.4th 414, 422-423 (*Balcom*); *People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2 (*Ewoldt*), superseded on other grounds by Evid. Code, § 1108.) This rule comes into play when the charged act, if done, could only be done with the requisite criminal intent. (*Balcom*, *supra*, at p. 422 [defendant charged with a rape at gunpoint; evidence of prior rape inadmissible to prove intent because no person using a gun could lack intent to use force]; *Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 925-926 [defendant sued for assaulting patients; evidence of prior assaults inadmissible to prove intent because no person who shoved a patient against a wall, as alleged, could lack intent to assault].) That rule does not apply to bar evidence of intent in this case. Here, Bucio admitted that she did certain acts, such as calling Aguilar and visiting the U.S. Bank the night before the robbery. Because these acts are not necessarily done with criminal

10

intent, and because Bucio vigorously argued that she lacked the intent to aid and abet the robbery of Singh, Bucio's intent was very much at issue in the trial.

Nor is the stolen merchandise evidence too dissimilar to shed light on Bucio's intent. Other acts are admissible to prove intent as long as those acts are "'. . . sufficiently similar [to the alleged crimes] to support the inference that the defendant "'probably harbor[ed] the same intent in each instance.' . . ." . . .' [Citation.]" (*Foster*, *supra*, 50 Cal.4th at p. 1328, citing *Ewoldt*, *supra*, 7 Cal.4th at p. 402.) The trial court admitted the stolen merchandise evidence in conjunction with the second robbery evidence because the intended target of the second robbery was Chavez, her supplier in the stolen merchandise ring. Because Bucio's solicitation of a second robbery is relevant and admissible to show that she intended to solicit the charged robbery, the trial court did not abuse its discretion in admitting the stolen merchandise evidence that gives the second robbery greater probative value. In light of this theory of relevance, it does not matter that the crimes of trafficking in stolen goods and robbery have different intent elements in the abstract.

Bucio lastly argues that the stolen merchandise ring is too unrelated to the charged robbery to be admissible to prove a common scheme or plan. Evidence of other acts may be admissible as the "individual manifestation" of a "general plan" if the other acts and charged acts have a "concurrence of common features." (*Ewoldt*, *supra*, 7 Cal.4th, at p. 402.) Bucio's solicitation of a second robbery is highly relevant to prove both her intent and a common scheme. As to both the charged and the uncharged, second robbery, Bucio solicited a gang member, selected a target she knew, and selected a target she believed had slighted her (Singh refused to buy her stolen goods and Chavez defrauded her). As we note above, the stolen merchandise evidence makes the second robbery evidence that much more probative.

Because the stolen merchandise evidence is relevant to prove motive, intent and a common scheme or plan, we need not reach Bucio's further argument that the trial court committed instructional error under *People v. Swearington* (1977) 71

11

Cal.App.3d 935, by allowing the jury to consider this evidence for a prohibited purpose.

B. *Statements From Cervantes's Pretrial Interview*

Bucio contends that the trial court should not have allowed the People to (1) elicit statements made by Cervantes, a prosecution witness, during a January 2009 police interview; and (2) call Detective Adam Wittkins (Detective Wittkins) to testify about when, during that interview, Cervantes was shown certain evidence consistent with his statement. We review these evidentiary rulings for an abuse of discretion (*People v. Jablonski* (2006) 37 Cal.4th 774, 805 (*Jablonski*)), and conclude no abuse occurred.

1. *Pertinent Facts*

Cervantes first spoke with police in November 2008 and testified before the grand jury a few weeks later. On both occasions, Cervantes lied and denied any involvement or knowledge of Singh's robbery. Cervantes met with police again in January 2009. By that time, Cervantes was charged with murder in this case; he sought a deal, but was not offered one. At that meeting, Cervantes admitted his involvement in the robbery. Cervantes met with law enforcement once again in March 2009. In July 2009, Cervantes signed a plea deal for which he received a sentence of 22 years in prison and dismissal of the greater charges that called for a life sentence.

At trial, Cervantes testified that he drove Aguilar to the U.S. Bank; that he waited with him until Bucio "marked" Singh as the intended victim; and that he drove Aguilar to get a gun and to pick up DeLeon so they could discuss her role as the getaway driver. On cross-examination, Bucio elicited that Cervantes had lied and denied any involvement in the robbery during his November 2008 interview and before the grand jury. Bucio also suggested that the interviewing officers during the January and March 2009 interviews were feeding Cervantes facts to flesh out his statements.

The People called Detective Wittkins to testify about (1) the statements Cervantes made during the January and March 2009 interviews; (2) the order in which

the officers showed evidence to Cervantes to rebut Bucio's allegation of police tampering. Over Bucio's objection, the trial court ruled that Cervantes's statements at the January and March 2009 interviews were prior consistent statements. The court reasoned that Cervantes's statements were admissible under Evidence Code section 791, subdivision (b), because those statements were made prior to the July 2009 executed plea bargain deal. The court alternatively relied on Evidence Code section 791, subdivision (a), reasoning that Cervantes's statements were inconsistent with his November 2008 statements and that subdivision (a)'s timing requirement (namely, that the prior consistent statement be made before the prior inconsistent statement) did not apply when the alleged inconsistent statement is the failure to mention a fact. Invoking Evidence Code section 356, the court allowed Detective Wittkins to testify regarding the order in which Cervantes was shown items vis-à-vis his statements "for the non-hearsay purpose of providing the jury with the context in which Cervantes's statements were made."

    2. *Analysis*

    a. *Cervantes's Prior Consistent Statements*

A party may elicit a witness's prior, out-of-court statements that are consistent with that witness's trial testimony if (1) the adverse party has made "an express or implied charge" that the witness's trial testimony is "recently fabricated or is influenced by bias or other improper motive"; and (2) the witness's prior statement "was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).) Bucio questioned Cervantes about his July 2009 plea deal, and her cross-examination painted him as a liar. (See *People v. Noguera* (1994) 4 Cal.4th 599, 630 (*Noguera*) ["'[t]he mere asking of questions may raise an implied charge of an improper motive'"].) Cervantes's plea deal provided a motive for him to fabricate his trial testimony. (*People v. Gurule* (2002) 28 Cal.4th 557, 620.) Because Cervantes's January and March 2009 statements were made *before* the July 2009 plea deal, they were properly admitted as prior consistent statements under Evidence Code section 791, subdivision (b). Bucio contends that Cervantes had

13

additional reasons to fabricate his testimony, such as a desire to obtain a favorable plea deal, that pre-dated his January and March 2009 interviews. These other motives do not affect our analysis because "'. . . a prior consistent statement is admissible if it was made before the existence of *any one or more of the biases or motives* that, according to the opposing party's express or implied charge, may have influenced the witness's testimony . . . .' [Citation]" (*Noguera*, *supra*, at p. 629, italics added; accord, *People v. Andrews* (1989) 49 Cal.3d 200, 210-211 [witness's motive to lie before and after plea deal are distinct motives].) In light of the admissibility of Cervantes's statements under Evidence Code section 791, subdivision (b), we need not analyze their admissibility under subdivision (a) of that section. (See *People v. Mason* (1991) 52 Cal.3d 909, 944 [appellate courts "review the trial court's ruling and not its reasoning"].)

b. *Order of Statements*

Where one party introduces "part of a[] . . . conversation . . . in evidence," an adverse party may inquire into "the whole on the same subject . . . ." (Evid. Code, § 356.) In this case, Bucio elicited from Cervantes some of the statements he made during the January and March 2009 interviews and implied that they were the product of coaching by law enforcement. Under the plain terms of Evidence Code section 356, the People were entitled to elicit other portions of those conversations to rebut Bucio's accusations. (See *People v. Zapien* (1993) 4 Cal.4th 929, 959.) Bucio argues that she only elicited from Cervantes's testimony regarding what he *did not say* during the interviews, but the record does not support this argument; we consequently do not reach Bucio's argument that Evidence Code section 356 is irrelevant because Cervantes's "non-statements" are not "part[s] of a . . . conversation . . . ." (*Ibid.*)

C. *Vasquez's Prior Consistent Statements*

Bucio also challenges the trial court's admission of statements Vasquez made during his August 2009 police interview. We review this claim for an abuse of discretion. (*Jablonski*, *supra*, 37 Cal.4th at p. 805.) There was no abuse.

14

1. *Relevant Facts*

Police interviewed Vasquez in early November 2008 and he testified before the grand jury later that month; he denied any knowledge of the charged robbery. Vasquez voluntarily met with police again in August 2009, at which time he admitted to knowing far more.

At trial, Vasquez testified that he had been present when Bucio and Aguilar discussed the robbery in Bucio's garage. In that conversation, he overheard Bucio refer to the victim as driving "a nice car." Vasquez also testified that Bucio had, after Aguilar's arrest, solicited Vasquez to rob a second man who owed her money and whom he "believe[d]" lived in "Oxnard." Vasquez noted that he was testifying under a grant of immunity. On cross-examination, Bucio elicited that Vasquez had attempted to curry favor with the police during the August 2009 interview by offering to help implicate drug dealers and by asking for help getting a job. Bucio also brought out that Vasquez had, since the August 2009 interview, violated his probation and failed to appear in court.

The People called Detective Michael Young (Detective Young) to testify to statements Vasquez made during the August 2009 interview. Over Bucio's objection, the trial court ruled that these statements were admissible as prior consistent statements because "the cross and the theory of the defense in this case" accused Vasquez of fabricating his testimony. Detective Young then recounted Vasquez's prior statements, including that Vasquez overheard Bucio and Aguilar plan the robbery of a guy who drove "a nice, white SUV" and that the intended victim of the second robbery owed Bucio money and lived in Camarillo.

2. *Analysis*

As we note above, a trial court may admit a witness's prior consistent statements if the witness's trial testimony is attacked as tainted by bias or other motive to lie, and if the prior statements were made before the alleged taint arose. (Evid. Code, § 791, subd. (b).) Bucio argues that Vasquez had a motive to lie at the time of the August 2009 interview, so his statements from that interview do not pre-date his

15

motive to lie. This argument ignores the rule that prior consistent statements are admissible as long as *any one* of the witness's motives to lie arose *after* the prior statement. (*Noguera, supra*, 4 Cal.4th at p. 629.) At the time of the August 2009 interview, Vasquez had not yet been granted immunity for his testimony and did not yet face sanctions for violating his probation or failing to appear. Statements Vasquez made before either of these additional motives to lie arose are accordingly admissible as prior consistent statements. (See *People v. Belmontes* (1988) 45 Cal.3d 744, 778, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390) ["An immunity agreement has been recognized as a motive for bias within the meaning of Evidence Code section 791"].)

Bucio argues that Vasquez's statements that Chavez owed her money and that Singh drove a "nice, white SUV" are inadmissible as prior consistent statements because they are neither consistent nor inconsistent with Vasquez's trial testimony. We disagree. Both at trial and at the August 2009 interview, Vasquez said Chavez owed Bucio money; Vasquez's statement at trial that Singh drove a "nice car" is similarly consistent.

Bucio finally argues that Vasquez's prior statement that Chavez lived in Camarillo is a prior *inconsistent* statement—not a prior *consistent* statement—because Vasquez testified at trial that Chavez lived "in Oxnard, I believe." Given Vasquez's uncertainty at trial, Vasquez's two statements are not necessarily inconsistent. In any event, it is not reasonably probable that Vasquez's uncertainty regarding which of two adjacent cities Chavez lived in would have affected the outcome of Bucio's trial. (*People v. Watson* (1956) 46 Cal.2d 818, 837.) Any error in admitting this particular statement by Vasquez was accordingly not prejudicial.

III. *Instructional Challenge*

Bucio argues that the trial court erred in not instructing the jury that Vasquez was, as a matter of law, an accomplice whose testimony could not support a guilty verdict without further corroboration. We review this instructional issue de

16

novo (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1311) and conclude that the trial court did not err.

A. *Pertinent Facts*

Vasquez testified that he overheard Bucio and Aguilar discuss the charged robbery, but did not participate in that discussion. Vasquez asked Aguilar if he could be involved, but Aguilar refused. Vasquez also stated that "we" cut a chain on a fence near the U.S. Bank to make the getaway easier. Vasquez further acknowledged that, after the robbery, he cut Aguilar's face with a knife to change Aguilar's appearance; that he accompanied Aguilar to get a tattoo; and that he shared in $34,000 of the proceeds.

Based on this evidence, the trial court did not find Vasquez to be an accomplice as a matter of law. Bucio's counsel did not disagree with this conclusion. Accordingly, the trial court left it to the jury to decide whether Vasquez qualified as an "accomplice" whose testimony required corroboration.

B. *Analysis*

A criminal conviction cannot stand if it rests solely on the testimony of an "accomplice." (§ 1111.) Consequently, if substantial evidence indicates that a witness is an accomplice, the trial court must instruct the jury to determine whether the witness is an accomplice and, if so, not to return a guilty verdict unless that accomplice's testimony is corroborated. (*People v. Tobias* (2001) 25 Cal.4th 327, 331 (*Tobias*).) A trial court may take the issue away from the jury and instruct the jury that a witness is an accomplice as a matter of law only if the "clear and undisputed" facts compel or dictate that conclusion. (*People v. Williams* (2008) 43 Cal.4th 584, 636; *People v. Avila* (2006) 38 Cal.4th 491, 565.)

An "accomplice" is a person who can be charged with the same crimes as the defendant. (*Tobias*, *supra*, 25 Cal.4th at p. 331). It includes persons who aid and abet the charged crimes. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 960.) To be liable as an aider and abettor, a person must (1) do something to aid, promote, or encourage the charged crime; (2) while knowing of the perpetrator's unlawful purpose;

17

and (3) while intending to encourage the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

The trial court did not err in concluding that Vasquez did not aid and abet the charge crimes as a matter of law. It is not enough that Vasquez overheard Bucio and Aguilar plan the robbery. (See *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530 ["[m]ere presence at the scene of a crime is not sufficient to constitute aiding and abetting"]; *People v. Johnson* (1973) 33 Cal.App.3d 9, 22 [overhearing others plotting a crime does not render one an accomplice as a matter of law].) Nor is it enough that Vasquez assisted Aguilar after the robbery. (E.g., *People v. Boyer* (2006) 38 Cal.4th 412, 467 (*Boyer*), superseded on other grounds by § 29.4 [an "accessory" is not an "accomplice"].) The only evidence that might support a ruling that Vasquez was an accomplice is Vasquez's statement that "we" cut a chain prior to the robbery. But Vasquez did not specify *who* cut the chain, and Vasquez's direct participation would be at odds with Aguilar's earlier refusal to let Vasquez participate. This falls short of the clear and undisputed evidence necessary to compel the conclusion that Vasquez was an accomplice as a matter of law.

Even if the trial court erred, any error was harmless in light of the corroboration of Vasquez's testimony. (*Boyer*, *supra*, 38 Cal.4th at p. 467.) Corroboration need only be "slight" and "tend to implicate the defendant." (*Ibid.*) In this case, Bucio's involvement in the charged crimes is corroborated by the sequence of events at the U.S. Bank the night before the robbery, which are further corroborated by phone records and video footage. Bucio's involvement is also buttressed by her solicitation of Vasquez to commit a second robbery, which is further corroborated by the record of calls between Bucio and Vasquez and by the fact that Bucio's phone number was saved on Vasquez's cell phone.

IV. *Remaining Claims*

Bucio lastly contends that her counsel was ineffective and that the cumulative effect of the above-asserted errors was prejudicial. Because we reject the merits of Bucio's claims, her counsel's performance with respect to those claims was

18

not prejudicial.  (*Strickland v. Washington* (1984) 466 U.S. 668.)  Furthermore, we find no merit to her claims, so there can be no cumulative error.

*DISPOSITION*

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

HOFFSTADT, J.[*]

We concur:

GILBERT, P. J.

PERREN, J.

---

[*] (Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to art. 6, § 6 of the Cal. Const.)

Kevin G. DeNoce, Judge

Superior Court County of Ventura
_____

Quin Denvir for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, Robert M. Snider, Deputy Attorney General, for Plaintiff and Respondent.